1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office

In the Matter of: )
)
)
GEORGE CALLAHAN, )
)
    Complainant, )
)
v. ) EEOC No. 100-2001-07992X
) Agency No. FNP-2001-018
GALE A. NORTON, SECRETARY, )
U.S. DEPARTMENT OF THE )
INTERIOR, )
)
    Agency. )
)

Room 332
1951 Constitution Avenue, N.W.
Washington, D.C.

Tuesday,
February 3, 2004

The above-entitled matter came on for

hearing, pursuant to notice, at 9:40 a.m.

BEFORE:  HONORABLE LEIGH A. REARDON
         Administrative Judge

APPEARANCES:

On behalf of the Complainant:

A. PATRICIA FROHMAN, ESQ.
4832 46th Street, Northwest
Washington, D.C.  20016
(202) 537-6114

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064



APPEARANCES:   (Continued)

On behalf of the Agency:

PATRICIA ARMSTRONG
Office of the Solicitor
1849 C Street, Northwest
Mail Stop 6530
Washington, D.C.   20240
(202) 208-6848

Also Present:

Candace Levy

3

# I N D E X

OPENING STATEMENT OF:                                    PAGE:

On behalf of the Complainant:                            waived
A. Patricia Frohman, Esq.

On behalf of the Agency:                                    9
Patricia Armstrong


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| George Callahan | 15 | 48 | 66 72 | 70 -- |
| Consuela Joy | 74 | 123 | 133 | 136 |
| Duane Erwin | 140 | 170 | 182 | -- |
| Suzanne Kelley | 183 | 195 | -- | -- |
| Lance Hatten | 198 | 205 | 209 | -- |
| Gloria Roberts (by telephone) | 211 | 230 | 239 | 240 |
| George Callahan (in rebuttal) | 242 | -- | -- | -- |


| EXHIBITS: | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| Complainant's: | | |
| Exhibit 1 | 38 | 39 |
| Agency's: | | |
| Exhibits 1.1 and 1.2 | 8 | -- |
| Exhibits 2-A through 2-K | 97 | 114 |
| Exhibit 3 | 149 | 149 |
| Exhibit 4 | 149 | 149 |
| Exhibit 5 | 142 | 143 |
| Exhibit 6 | 142 | 143 |
| Exhibit 7 | 214 | -- |

4

# I N D E X

CLOSING STATEMENT OF:                                    PAGE:

On behalf of the Complainant:                            waived
A. Patricia Frohman, Esq.

On behalf of the Agency:                                 waived
Patricia Armstrong

P R O C E E D I N G S

1                                                    9:40 a.m.

2          JUDGE REARDON:  Good morning.  I'm

3  Administrative Judge Leigh Ann Reardon.  I've been

4  assigned by the Equal Employment Opportunity Commission

5  to conduct the hearing in the discrimination complaint

6  filed by George Callahan against the U.S. Department of

7  the Interior, identified as EEOC Number 100-2001-07992X

8  and Agency Number FNP-2001-018.

9          During a pre-hearing conference held on

10  January 22nd, 2004, the parties stipulated that the

11  issues before me for hearing are as follows:

12          Whether Complainant was discriminated against

13  on the basis of retaliation for prior EEO activity

14  when:

15          1) He was not promoted to a GS-7 on or around

16  October 19th, 1999, and October 20th, 2000;

17          And 2) he allegedly had his wages improperly

18  offset during the latter part of 2000.

19          May I have the appearance on behalf of the

20  Complainant, please?

21          MS. FROHMAN:  Good morning, Your Honor.  My

22  name is Patricia Frohman.

23          JUDGE REARDON:  Would you please state your

24  business address and --

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    brief argument in support of objections.  However,

2    after I have entered a ruling, I will not entertain any

3    further argument.

4        Please address any requests to go off the

5    record to me rather than to the court reporter.

6        Are there any preliminary matters before we

7    begin with witness testimony?  Stipulations, exhibits?

8        MS. ARMSTRONG:  Yes, we do have stipulations

9    of fact.

10       JUDGE REARDON:  And would you care to read

11   those?  I know they're short, so why don't we just read

12   those into the record.

13       MS. ARMSTRONG:  Complainant, George Callahan,

14   is employed by the National Park Service, National

15   Capital Region, National Capital Park Central, Mall

16   Operations as a park ranger, interpretation, GS-0025-5.

17       Stipulation of Fact Number 2, upon completion

18   of the investigation, Complainant requested a hearing

19   before an EEOC administrative judge.

20       Stipulation of Fact Number 3, Complainant did

21   not receive a career ladder promotion to the GS-7 level

22   in October 1999.

23       JUDGE REARDON:  Does Complainant so

24   stipulate?

25       MS. FROHMAN:  Yes, Your Honor.

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

8

1          JUDGE REARDON:  Thank you.

2          Ms. Armstrong, I believe you have an observer

3     with you today.  We should probably make note of that

4     for the record.

5          MS. ARMSTRONG:  Yes.  This is Candace Levy.

6          JUDGE REARDON:  Thank you.

7          And you wanted to, I think, discuss this

8     AWOL?

9          MS. ARMSTRONG:  Yes.  I guess this should be

10    marked Agency Exhibit Number 1.  It is a memo dated

11    February 2nd, 2004, from Consuela Joy to me referencing

12    that all absent without leave has been changed to leave

13    without pay for the calendar years 1999 to 2001, and

14    also attached to the memorandum are the amended time

15    and attendance sheets which show that all AWOL was

16    changed to leave without pay for the --

17         JUDGE REARDON:  Thank you.

18         MS. ARMSTRONG:  -- time period.

19                      (The documents referred to

20                      were marked for identification

21                      as Agency's Exhibits 1.1 and

22                      1.2.)

23         JUDGE REARDON:  And given these documents,

24    Ms. Frohman, I assume that there is no further issue of

25    AWOL that needs to be addressed during the hearing?

1          MS. FROHMAN:  That's correct, Your Honor.

2          JUDGE REARDON:  Thank you.

3          Let's go off the record for one moment.

4          (Discussion held off the record.)

5          JUDGE REARDON:  Do the parties wish to make

6   opening statements?

7          MS. FROHMAN:  I'll waive opening statement.

8          JUDGE REARDON:  Ms. Armstrong?

9          MS. ARMSTRONG:  Yes, the Agency would like

10   to.

11          JUDGE REARDON:  Would you like to do it at

12   this time or at the beginning of your case in chief?

13          MS. ARMSTRONG:  Okay.  I can wait.

14          JUDGE REARDON:  No, either is fine.  It's

15   your -- up to -- whatever you'd like.

16          MS. ARMSTRONG:  It doesn't matter, actually.

17   So, I'm flexible.

18          JUDGE REARDON:  Why don't you just go ahead

19   and do it now.

20          MS. ARMSTRONG:  Okay.

21    OPENING STATEMENT BY REPRESENTATIVE FOR THE AGENCY

22          MS. ARMSTRONG:  Complainant began his

23   employment with the U.S. Park Service as an

24   interpretive ranger, GS-5, in August 1998.  He obtained

25   this position as a result of the settlement of an EEO

15

1    Honor?

2              JUDGE REARDON:  Yes.

3              (Pause)

4    Whereupon,

5                   GEORGE CALLAHAN

6    having been first duly sworn, was called as a witness

7    herein and was examined and testified as follows:

8                   DIRECT EXAMINATION

9              BY MS. FROHMAN:

10       Q    Mr. Callahan, would you state your name,

11   please?

12       A    George Gordon Callahan.

13       Q    And what is your address?

14       A    3332 F Street, Northwest.

15       Q    And your present employment?

16       A    National Park Service, Department of

17   Interior, Mall Operations.

18       Q    And your grade?

19       A    GS-5.

20       Q    When did you start doing any work for the

21   Park Service?

22       A    I began as a volunteer in 1991.

23       Q    And what were you doing then?

24       A    I had a -- I was a victim of a severe random

25   violence and had run across a few park rangers and they

1    point because I don't know why we're going into the --

2    to the -- I mean, that's the merits of the old

3    complaint, it seems, his opinion thereof about the

4    merits or the qualifications of the other people on the

5    cert.

6    JUDGE REARDON:  I had the same question,

7    actually, because I think we -- I don't think there's

8    any dispute that his appointment was due to the

9    settlement of that former complaint, is there?

10    MS. ARMSTRONG:  No.

11    MS. FROHMAN:  No.  Your Honor, I'm simply

12    pointing out that the fact that he had had years of

13    experience on the Mall.  But I'm willing to -- happy to

14    go on.

15    JUDGE REARDON:  Please do.

16    BY MS. FROHMAN:

17    Q    What was the result of your complaint that

18    you filed?

19    A    I was given a career ladder position.

20    Q    Well, what -- pursuant to what?

21    A    My complaint.

22    Q    Well, was there -- was it settled?

23    A    Yes.

24    Q    All right.  And the settlement agreement?

25    A    That I be put in a career ladder position and

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1      A     Around 1999.

2             JUDGE REARDON:  I'm sorry, Ms. Frohman.  Are

3    we just trying to establish when his time in grade

4    would have been up?

5             MS. FROHMAN:  Yes.

6             JUDGE REARDON:  Perhaps the parties could

7    stipulate as to that?

8             MS. ARMSTRONG:  Okay.  The 50s in the file,

9    13-A.  He became a four effective July 20th, 1998.

10   It's in Exhibit -- ROI Exhibit 13-B.  He became a --

11   10/20/98.

12            MS. FROHMAN:  I'll stipulate to that.

13            JUDGE REARDON:  Thank you.  Let's move on.

14            MS. FROHMAN:  Very well.

15            BY MS. FROHMAN:

16      Q     Did you receive a rating after you completed

17   your 90 days as a GS-4?

18      A     I moved to a GS-5.

19      Q     Did you receive a rating at that time from

20   your supervisor?

21      A     As far as a -- I'm trying to think of a word

22   they call it -- evaluation?

23      Q     Yes.

24      A     Yes, I did.

25      Q     And what was that evaluation?

1    out and audit my talk anytime he felt like it.

2         Q    And did he ever do that?

3         A    Yes.

4         Q    He audited it?  He did come out and audit

5    your talk?

6         A    I believe so.

7         Q    Which talk was that?

8         A    I don't -- I'm treading.  (Pause)

9         Q    There was a time when -- when Mr. Erwin

10   audited a talk of yours?

11        MS. ARMSTRONG:  Objection.  I'm not sure if

12   that's leading, testifying to the question.

13        MS. FROHMAN:  It's a question.

14        JUDGE REARDON:  Well --

15        MS. FROHMAN:  I don't think it's leading.

16        JUDGE REARDON:  I think it's asked and

17   answered, though, if nothing else.  I mean, he said

18   there was one that was audited, he doesn't recall when,

19   by Mr. Erwin.

20        MS. FROHMAN:  All right.  Let me -- I would

21   like to offer this into evidence.  This is Shelly

22   Market.  This is not --

23        JUDGE REARDON:  This is not something that's

24   any attachment or a part of the ROI?

25        MS. FROHMAN:  -- something that's in --

1    right.

2              JUDGE REARDON:  Yes.  Please mark it as

3    Complainant's Exhibit 1.

4              MS. FROHMAN:  All right.

5                        (The document referred to was

6                        marked for identification as

7                        Complainant's Exhibit 1.)

8              BY MS. FROHMAN:

9        Q    Mr. Callahan, I'm going to show you what's

10   been marked as Complainant's Exhibit 1 and ask you if

11   you can tell me what this is.

12       A    (Pause)  This is evaluation of my talk dated

13   May 2002 at the Vietnam Veterans Memorial.

14       Q    And is that the talk that he audited?

15       A    Yes.

16       Q    Is there any other talk that he audited?

17       A    No.

18       Q    All right.  Thank you.

19              And prior to that, had you ever turned him

20   down when he asked you --

21       A    Never.

22       Q    -- to audit a talk?

23       A    Never.

24       Q    So that was the first time he had asked you?

25       A    Yes.

1          MS. ARMSTRONG:  Okay.  Is that being

2     admitted?

3          MS. FROHMAN:  I move that it be admitted into

4     evidence.

5          JUDGE REARDON:  Is there any objection?

6          MS. ARMSTRONG:  Yes, because this case is

7     about 1990 -- the years 1999 and 2000.  What happened

8     in 2002 I don't think is relevant to this matter.  But

9     again, it shows that he didn't do -- he didn't do the

10    formal interpretive talk in '99 and 2000, as the Agency

11    has already stated.

12         MS. FROHMAN:  Your Honor, it also shows that

13    he was not given the opportunity until 2002.

14         JUDGE REARDON:  Well, I don't know that it

15    shows that at all, actually.  It shows that he was

16    audited in 2002.  Beyond that, that's an inference to

17    be drawn.

18         But I'm going to admit it into evidence.  I

19    think it's relevant.

20         MS. FROHMAN:  Thank you, Your Honor.

21                              (The document previously

22                              marked for identification as

23                              Complainant's Exhibit 1 was

24                              received in evidence.)

25

44

1      A    Educational programs I've given in the past,

2   prior to my experience with the National Park Service.

3      Q    No, but had you given any as -- have you

4   given any educational programs as a ranger?

5      A    No.

6      Q    Okay.  Any other -- there came a time when

7   you said that you had missed a lot of work.  Mr. -- you

8   testified that Mr. Erwin said you had missed a lot of

9   work?

10     A    Yes.

11     Q    And is that true?

12     A    Yes.

13     Q    And why was that?

14     A    I have -- I'm in remission from cancer, and I

15  had cancer at the time and I was receiving

16  chemotherapy.

17     Q    And how much time would -- have you

18  calculated how much time you missed, approximately, a

19  year?

20     A    I might be inverting the numbers.

21  Approximately in 1999, some 50-some odd percent of the

22  time.  In 19 -- in 2000, perhaps 60.  The numbers may

23  be inverted.

24     Q    You missed --

25     A    Yes.

1          MS. FROHMAN: Excuse me.  May I ask, which

2     exhibit are you referring to?

3          MS. ARMSTRONG:  I'm at 15-A, page 3.

4          MS. FROHMAN:  (Pause)  Yes, thank you.

5          THE WITNESS:  Yes.

6          BY MS. ARMSTRONG:

7     Q     And you received this appraisal, at least,

8     looking at your signature, the standards, in October

9     '98?

10    A     Mm-hmm.

11    Q     And signed it in it appears 1999?

12    A     Yeah.

13    Q     And wasn't this attached to the performance

14    standards?

15    A     Yes, it was.

16    Q     Okay.  And isn't it true that the eight

17    informal logs are written products?

18    A     Yes.

19    Q     And isn't it true that you have not submitted

20    eight informal logs in 1999 nor in 2000?

21    A     Yes, or no.  No, I haven't.

22    Q     But it's still your testimony you didn't know

23    about these logs until 2000 when Mr. Erwin told you?

24          MS. FROHMAN:  Excuse me.  May I say that it

25    wasn't his testimony.  He testified that he had not

1      Q      Page 3.

2      A      (Pause)

3      Q      And again, did you see this performance

4   standard or performance agreement attached to your

5   performance appraisal for that three-month time period?

6      A      Yes.

7      Q      Mr. Callahan, and Mr. Goring did look at one

8   of your informal talks, isn't that --

9      A      Yes, he did.

10     Q      I mean, your formal talk?

11     A      Yes.

12     Q      And isn't it correct that Mr. Goring did not

13  say that you had successfully passed that formal talk?

14     A      Could you rephrase that for me, please?

15     Q      Isn't it correct that Mr. Goring wrote a

16  formal evaluation of your talk?

17     A      Yes.

18     Q      And not once in that evaluation does Mr.

19  Goring say you successfully complete that evaluation,

20  isn't that correct?

21     A      I don't recall that being --

22     Q      Okay.  Does -- let's look at Exhibit 12,

23  then.

24     A      Okay.  (Pause)  Page what?

25     Q      One.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    A   No, he doesn't.

2    Q   Right.  But when Mr. -- in 2002.  Let's look

3   at Complainant's Exhibit Number 1.  In 2002, does not

4   Mr. Erwin state that you successfully met the

5   requirements?

6    A   Mm-hmm.

7    Q   In 2002?

8    A   Yes.

9    Q   After he evaluated your talk?

10    A   Yes.

11    Q   Okay.  Did -- did Mr. Erwin again explain to

12   you in 2000 that you needed to do a formal talk as well

13   as the eight written logs to get promoted?

14    A   He mentioned that.

15    Q   Okay.  And in fact, he wrote it down, isn't

16   that correct, in a memo to you?

17    A   Yes, he did.

18    Q   Okay.  And not once does he say you have to

19   do an educational program, isn't that correct?

20    A   He -- he had mentioned an educational program

21   prior to that, prior to the memo.  He had mentioned

22   several -- prior to the memo -- several requirements

23   prior to the memo.

24    Q   But in the memo written to you --

25    A   No, he --

57

1      Q    -- to clarify the process, he explained to

2   you what was required?

3      A    In the memo which was given to me after I

4   filed my EEOC complaint he specified the eight

5   interpretive logs.

6      Q    But isn't it true you didn't come to Mr.

7   Erwin about promotion until August 2000?

8      A    I had --

9           MS. FROHMAN:   Can I object?  Because that

10   isn't what he testified.

11          JUDGE REARDON:  Well, I'll overrule the

12   objection.  Please answer the question.

13          THE WITNESS:   Okay.  Would you repeat the

14   question?

15          BY MS. ARMSTRONG:

16     Q    Isn't it a fact that you did not come to Mr.

17   Erwin regarding promotion until 2000, August 2000?  Or

18   November 2000?

19     A    I believe it was November 2000.

20     Q    Right.  Isn't that correct?  That you didn't

21   come to Mr. Erwin until let's say November 2000

22   regarding promotion?

23     A    I'm a little --

24     Q    Okay.  Well, let's look at Mr. Erwin's

25   recollection of your conversation, ROI Exhibit 2, page

58

1    27.

2        A    Do you have the exhibit number?

3        Q    Exhibit 2, page 27.

4        A    (Pause)

5        Q    Isn't it a fact that you -- one week prior to

6    November 19th -- you had a meeting, sorry, November

7    13th in which you discussed the requirements to go from

8    the 5 to the 7 level?

9        A    Mm-hmm.  Yes, I'm sorry.

10       Q    And isn't it a fact when you came to Mr.

11   Erwin about promotion that you believed your EEO

12   settlement agreement entitled you to promotion based on

13   year in grade?

14       A    No.

15       Q    So you never stated that you had a promise

16   from the Agency or understanding with the Agency that

17   you would be promoted after one year to the 7 level?

18       A    No, it was that I was the -- that I was in a

19   career ladder position, that I was to meet the

20   requirements of everyone else who was in a career

21   ladder position.

22       Q    Oh, that's funny.  Did you tell the

23   investigator the same thing?

24       A    I don't recall.

25       Q    Okay.  Well, in your -- let's look at your

59

1    rebuttal statement to the EEO investigator, ROI Exhibit

2    11.

3        A    (Pause)

4        Q    Page 26.

5        A    (Pause)

6        Q    In line 13.

7        A    (Pause)   Line 13?

8        Q    Mm-hmm.

9        A    Okay.

10       Q    That you would spend a year as a 5, a year as

11   a 7, and a year as a 9?

12       A    Mm-hmm.

13       Q    Does it state anywhere in there that you

14   would have to do the -- the requirements for promotion?

15       A    Not that I see.

16       Q    Okay.  So it is your testimony that you need

17   to do the requirements in order to get promoted?

18       A    That I would have to live up to the

19   standards, sure.

20       Q    That all the other park rangers had to do to

21   get promoted from the 5 to the 7, is that your

22   testimony on today?

23       A    Yes.

24       Q    Okay.  Have you seen the responses to the

25   grievances that were submitted to --

1    A    I have glanced, yes.

2    Q    And you've seen that every of the park

3  rangers have done the formal as well as the informal

4  logs to get promoted from the 5 to the 7?

5    A    Most -- yeah.

6        MS. FROHMAN:  Can I object to that question?

7  Because I don't think that's what it shows.

8        JUDGE REARDON:  You object to the character

9  -- well --

10        MS. FROHMAN:  Yeah, I object to her

11  characterization as --

12        MS. ARMSTRONG:  Well, he agreed, so --

13        JUDGE REARDON:  Well, I'm going to overrule

14  the objection.  You can address that on redirect if --

15        MS. FROHMAN:  I'd say the documents speak for

16  themselves.

17        JUDGE REARDON:  I made my ruling.

18        MS. FROHMAN:  Thank you, Your Honor.  Sorry.

19        BY MS. ARMSTRONG:

20    Q    You and Mr. Erwin, as a result of this

21  November 2000 conversation, agreed to talk on December

22  14th about the interpretive requirements, do you recall

23  that?

24    A    Again?

25    Q    December 14th, 2000; you and Mr. Erwin agreed

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    in November 2000 to discuss -- to meet in December 2000

2    to discuss the interpretive requirements, do you recall

3    that?

4        A    I don't recall meeting with him after that.

5        Q    Okay.  Could it have been because you weren't

6    at work?

7        A    It could have been.  I don't recall that

8    there was a meeting.

9        Q    Okay.  Let's look at your time and attendance

10   sheet for December because it is your position that --

11   that it was not your fault that your formal

12   interpretive program was not audited, is that your

13   position?

14       A    Could you repeat that again?

15       Q    Is it your position that it was the Agency's

16   fault and not your fault that the formal -- your formal

17   interpretive program has not been audited in the years

18   '99 and 2000?

19       A    Yeah.

20       Q    Okay.  Let's look at 2000.

21       A    Sure.

22       Q    You were supposed to meet on December 14th.

23   ROI Exhibit Number 22 and 23 for your synopsis of your

24   time.

25       A    (Pause)

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    Q    Isn't it true, Mr. Callahan, you weren't at

2    work December 14th; you weren't at work that whole

3    entire pay period, isn't that correct, to meet with Mr.

4    Erwin?

5    A    Yes.

6    Q    Yes.

7    A    Which page are you on?

8    Q    I'm at page 3, but your time and attendance

9    sheets follow.

10    A    And it's pay period?

11    Q    Twenty-six.

12    A    Twenty-six.

13    Q    December 14th.

14    A    That --

15    Q    Right.  And then the next pay period, 01-01

16    you weren't at work, either.

17    A    Right.

18    Q    I guess December 25th would be a holiday, so

19    -- and let's look at the next pay period.  You weren't

20    at work either, 01-02?

21    A    I agree.

22    Q    Next pay period.  You weren't at work either,

23    01-03?

24    A    Exactly.

25    Q    Next pay period, 01-04.  You weren't at work

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

63

1    either.

2        A    No.

3        Q    So that's almost three months later.

4        A    Yes.

5        Q    And let's even look at earlier 2000.  You

6    were out, and you've already admitted you were out a

7    significant time period in 2000 as well as in 1999,

8    isn't that true?

9        A    That's true.

10        Q    Okay.  And when you were out, you were

11    receiving healthcare benefits, were you not?

12        A    Yes, I was.

13        Q    And you were not paying for them, isn't that

14    correct?

15        A    Not as I recall.

16        Q    But there is an employee share to pay for

17    healthcare benefits, isn't that true?

18        A    As I recall.

19        Q    Okay.  And December '99 you also state that

20    you were at work to the best of your recollection.  Is

21    that your testimony?

22        A    To the best of my recollection.

23        Q    But isn't it true you submitted a doctor's

24    note in December '99 requesting time off?

25        A    By who?  Which doctor?

1  perform the duties all the other rangers performed as

2  far as giving regular interpretive programs, and living

3  up to the standards as they were explained to me at the

4  time.

5           JUDGE REARDON:  And did that include doing

6  the eight logs?

7           THE WITNESS:  That wasn't never made clear to

8  me because the union grievances were going on at the

9  time.

10          JUDGE REARDON:  And where did you develop

11  this understanding of what you had to do that you just

12  told me?  From what sources or source?

13          THE WITNESS:  From the union steward and most

14  of my coworkers and my supervisor.  I mean, I didn't

15  feel that I was working in a hostile environment, so it

16  was -- there wasn't any friction as far as that goes.

17  There wasn't any -- I -- I understand, I'm sorry.

18          JUDGE REARDON:  Do the parties want to ask

19  any other questions just based on my very limited

20  questioning?

21          MS. FROHMAN:  Yes.

22              FURTHER REDIRECT EXAMINATION

23      BY MS. FROHMAN:

24      Q    When did you -- I think we've been over this,

25  but when did -- when were you first told that in order

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

74

1    moment.

2              (Pause)

3              JUDGE REARDON:  Ms. Armstrong, will you

4    please call your first witness?

5              MS. ARMSTRONG:  Consuela Joy.

6              JUDGE REARDON:  Ms. Joy, will you please

7    raise your right hand?

8    Whereupon,

9                        CONSUELA JOY

10   having been first duly sworn, was called as a witness

11   herein and was examined and testified as follows:

12                   DIRECT EXAMINATION

13             BY MS. ARMSTRONG:

14        Q    Ms. Joy, can you state your full name for the

15   record?

16        A    Consuela M. Joy.

17        Q    And --

18             THE REPORTER:  Speak up, please.  I'm sorry.

19             THE WITNESS:  Consuela M. Joy.

20             BY MS. ARMSTRONG:

21        Q    Ms. Joy, are you referred to another name

22   other than Consuela?

23        A    Connie.

24        Q    What is your position?

25        A    Administrative officer.

                    EXECUTIVE COURT REPORTERS, INC.
                          (301) 565-0064

1    about a promotion.

2    Q    Okay.  Did any -- at any point in time did --

3    did you hear from Ms. Donaldson that Mr. Callahan

4    thought that he should receive an automatic promotion?

5    A    Yes.  That was part of what prompted me to

6    get a copy of the resolution.

7    Q    And this is already in the record, but I'm

8    just going to show you Agency Exhibit 1, which is

9    attached to the Agency's Motion for Summary Judgment.

10    Is that the resolution agreement that you obtained?

11    A    (Pause)  Yes, it is.

12    Q    And Ms. Joy, did the settlement agreement or

13    resolution agreement, based upon your opinion, entitle

14    Mr. Callahan to be promoted without meeting necessary

15    requirements?

16    A    No, it did not.

17    Q    At the time Mr. Callahan was placed in the

18    GS-4 ranger position, had the ranger series become two

19    grade intervals, 5-7-9?

20    A    I would need to look at the date that he

21    became --

22    Q    I'm showing you again what's already in the

23    record, Agency Exhibit 1, which is attached to its

24    motion for summary judgment.

25    A    (Pause)  The grade had been probably in

1    implementation about 1998.  The Agency had been working

2    with the Office of Personnel Management to move the

3    positions from -- in the past they were -- at the time

4    that the announcement was announced, you had what we

5    call park ranger or park technicians.  And they were 4-

6    5-6.  And then, when you got to the Grade 7, you moved

7    into the two-graded interval series.

8         The recruitment and retention of individuals

9    was hard to do, and so Park Service initiated action

10   with the Office of Personnel Management to

11   professionalize the position, which also came with some

12   positive education requirements that the 4-5-6-7

13   technician-type jobs didn't.

14        And so in 19 -- I would say in '98 we got

15   approval, and early 1999, approximately April of '99,

16   Park Service began to go around the country and began

17   to train personnel specialists because at that time I

18   was chief of classification for the National Park

19   Service.  And so part of the role that I was going to

20   play was going to be to train individuals, but then I

21   left, so the implementation took place in early

22   probably May '99.

23        Q    And why did Mr. Callahan move from a GS-4 to

24   GS-5?

25        A    I was advised that because the individuals

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    that had been on the promotion certificate which was

2    issued by OPM when the jobs were announced as 4 had

3    also been given the privilege of being grandfathered

4    into the professional jobs at the entry-level 5 and the

5    career ladder promotions, that management decided in

6    all fairness, because Mr. Callahan was on the same cert

7    as many of the other individuals, to just -- even

8    though the resolution didn't call for it, even though

9    they could have left him in the single-interval series,

10   they moved him to the -- to the double-step.

11           Q    Which would be -- is that -- is that the 5-7-

12   9?

13           A    Yes, 5 would have been the first level of it.

14           Q    But at the time of the settlement agreement

15   or -- excuse me.  Strike that.

16           At the time Mr. Callahan had applied for the

17   position and not selected, was it a 4-5-6 position?

18           A    Yes.

19           Q    And did the other employees who were selected

20   off of the cert in 1997, I believe, were they also

21   placed in the 5-7-9 series?

22           A    Yes, they were.

23           Q    Ms. Joy, did you know that Mr. Callahan had

24   filed an EEO complaint in the past?

25           A    I knew from the perspective of fact that they

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    unit employees, i.e. the rangers, filed a grievance

2    about promotion issues within the National Mall?

3        A    Yes, there did come a time, but they were all

4    treated as individual grievances.  It was not a union-

5    filed grievance, and the reason why they were treated

6    as individual grievances is because they all had

7    individual issues.  Some were at the Grade 5, believing

8    that they should be at the Grade 7.  Some were already

9    at the Grade 9, believing that they should have been

10   hired at the 9, therefore we owed them money back when

11   they got picked up as a 5.  They all had various

12   issues, and so I made a determination that there was

13   not one that had a like issue.  So they were treated as

14   individual grievances.

15       Q    And do you remember when that grievance or

16   those grievances were approximately filed?

17       A    I can tell you that I walked in the door on

18   May 10th.  I can tell you that probably by May 20th I

19   was approached about the relevancy of competencies as

20   it relates to the merit promotion process.  I had a

21   meeting with the rangers.  I listened to their issues.

22   I advised them that basically it sounded like they had

23   a variety of issues and that I was willing to waive the

24   time frames and they could in fact file their

25   grievances because of the issues.

1      Q    Do you remember what the grievance was about

2    specifically with respect to the competencies?

3      A    As it related to the competencies,

4    individuals were doing tapes.  That was the final phase

5    after they had done their informal modules and all.

6    And the tapes were getting hung up.  Either they were

7    getting lost or they were -- because they didn't have

8    that many people trained as certifiers, it was taking

9    them a while to get to reviewing the tapes and

10   determining --

11     Q    Let me stop you.

12     A    Okay.

13     Q    What were the tapes?

14     A    The tapes were of the formal talks.

15     Q    Okay.

16     A    A formal interpretive talk.

17          JUDGE REARDON:  Can I -- I don't like to

18   interrupt counsel's line of questioning generally, but

19   could we just go back a step beyond that to what are

20   the competencies --

21          MS. ARMSTRONG:  Yeah, okay.

22          JUDGE REARDON:  -- and when they came into

23   play, who they applied to.

24          MS. ARMSTRONG:  Okay.

25          THE WITNESS:  The competencies, and I was not

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    party to the competencies in the beginning, so I'm

2    going to have to go from having been a director of

3    human resources as I walked in the door and I was

4    presented with the complaint.

5        The complaint alleged that competencies were

6    being utilized to make a determination of whether or

7    not an individual met the qualifications as it relates

8    to performance to move to the next level.  The

9    competencies --

10        BY MS. ARMSTRONG:

11    Q    Performance is that promotion to the next

12    level?

13    A    Performance of the duties and

14    responsibilities at the particular grade level and

15    potential to perform at the next level.  What they had

16    done was they had taken the chief rangers, and Park

17    Service-wide.  So it's a Service-wide standard.  They

18    were concerned that they had taken the steps to

19    professionalize the park ranger series but managers

20    were not necessarily secure on the consistency on a

21    Service-wide basis as to what did somebody really have

22    to do and to what degree in order to be promoted.  So

23    they decided that they would develop competencies.

24        The competencies were based on several

25    things.  The first thing they did was look at how were

84

1    the jobs classified.  So they looked at the

2    classification standards and said, okay, the jobs, in

3    order to do this at the 5, you have to be able to do

4    this.  In order to do this at the 7, you have to be

5    able to do this.  In order to do this at the 9, you

6    have to do -- do this.

7              Then, the next step in any classification

8    process is tied to the qualifications process, which is

9    the knowledges, skills, and ability.  So they looked

10   at, what did the classification standards say as it

11   related to the knowledges, skills, and abilities at the

12   various grade levels.

13             Then they put together what we call monitors.

14   In order to be able to pass the competency to go from

15   a 5 to a 7 as far as being determined competent, they

16   determined it took this.  And they tied it all to the

17   same standards that you use for classifying a job.

18             The one thing that I found out when I walked

19   in the door was that they were inconsistent on a Park

20   Service-wide basis as to how they were applying the

21   competencies.  Some people were thinking that the

22   competencies controlled the merit promotion process.

23   If you don't get --

24        Q    And was the Mall operating under that?

25        A    The Mall was operating under that provision.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    If you don't pass your competency, you don't get
2    promoted.
3              I then asked the question of the Washington
4    office -- mind you, over a period of time, because
5    there's transition of people that have years of
6    personnel experience, you lose something in the
7    process.  And a lot of Interior personnelists had
8    retired, as well as OPM.  There was a period of time
9    when there was a lot of early-outs.
10             And what they had done is they established
11   these competencies but they didn't get them validated
12   by the Office of Personnel Management as a legitimate
13   tool to tie to promotions.  And so without a
14   validation, and the validation is normally done, number
15   one, to be sure did it truly relate to the job; number
16   two, are there any EEO ramifications through a taping.
17   I think they could not really use it for promotion
18   purposes.
19             And I would tell you that probably 85 percent
20   of the Park Service was not using that.  The region,
21   unfortunately, used it and thought that they were
22   supposed to be tying the promotions to the
23   competencies.
24             So when I came in, I arranged for a meeting
25   with the Washington office staff and all parties

Case 1:05-cv-02170-RBW    Document 17-3    Filed 10/30/2006    Page 36 of 69.

86

1   involved and through the echelon of different levels.

2   So you end up with Washington level and you end up with

3   the Park Service level, then you end up with the park

4   level, and I was at the park level.

5          So we looked at it.  We indicated that,

6   truly, the competencies were not intended to be a

7   mandatory tool.  It was an enhancement.  It would give

8   the managers some consistency as to what the

9   expectations were.

10.         OPM has now gone to the point of they have

11  competencies for every series:  competencies for

12  administrative jobs, you know.  They -- they just feel

13  like it's a better tool to assist the manager in being

14  able to measure what the individual should be doing.

15  People get kind of caught up in trying to interpret the

16  difference between one grade level versus another grade

17  level versus actual performance versus potential

18  performance.  So it kind of gets put as a tool.  If

19  somebody completes it, what it does is it better

20  prepares you to do your job.

21          However, it is tied, excuse me, directly back

22  to the classification standards as to what managers

23  should be expecting from you.  So it was kind of hard

24  to separate out and say competencies have no bearing.

25  Then you would be saying that there was no virtue to

1    the staff work that we've done.  So while we can say

2    that the taping and the passing of the tapes and review

3    was not mandatory, it also took away the judgment of

4    the supervisor, who gets to see the individual more

5    frequently than one tape, of making that decision.

6             So you couldn't turn around and say, well,

7    now you can't apply your normal principle of looking at

8    classification and looking at what you can expect and

9    act like it's not going to have some bearing on the

10   competencies.  It's just that if you chose not to do

11   the competencies, didn't matter.  If you did it, then

12   it enhanced and helped prepare you better for dealing

13   with the general public.

14             I hope that answers your question.

15        Q    Well --

16             JUDGE REARDON:  Let me ask you one very

17   direct question, then.  In October of 1999, what were

18   the requirements for a park ranger in this region to

19   get promoted from a GS-5 to a GS-7, if there were any?

20             THE WITNESS:  There were.  What we did is we

21   basically had a meeting, and we determined that the

22   individuals had to meet several things.  The difference

23   between the 5 and the 7 dealt with a 5 ranger had to be

24   able to satisfactorily present informal interpretive

25   talks.  They had to also be able to do formal

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    make a clarification of it.

2         And believe it or not, there are times where

3    -- I know there are some times where someone will say,

4    can you tell me where Lincoln is, and the ranger will

5    say, he was standing right in front of Lincoln, so I

6    told him, you're standing right there. And they will

7    actually write that down. Well, then the supervisor

8    would have to say, you know, that's not going to get us

9    a true personal services kind of contact, and will

10   correct that kind of situation.

11        But they were required to do eight of those,

12   and they were required to do one -- although it wasn't

13   the only one they did, but they were required to do a

14   formal interpretive talk, an educational, kind of

15   historical one that was scheduled, the supervisor

16   actually reviewed it, was there, audited it. I'm also

17   being told that they were allowed, if they cared to, to

18   tape it and let the supervisor review that. But those

19   were the determinations as to going from a 5 to a 7.

20        BY MS. ARMSTRONG:

21   Q    And when the competencies were in place, what

22   did the ranger do with the logs and the tapes? Where

23   did they send them?

24   A    They actually went to Harper's Ferry. And

25   basically, when they went to Harper's Ferry, the

1    individuals who had been trained and were certified

2    would review them and would pass judgment.  The

3    individual --

4        Q    Did that change after the grievance was

5    resolved?

6        A    Meaning?

7        Q    Sending tapes to Harper's Ferry for

8    certification.

9        A    No.  It didn't change the competencies

10    requirements.

11        Q    Was it still a requirement, though, to send

12    your tapes to -- and your logs to Harper's Ferry for

13    certification?

14        A    Only if you were going to be certified.

15        Q    Okay.  But for promotion purposes?

16        A    No, no.

17        Q    So, who would then now audit the formal talks

18    as well as review the eight --

19        A    Supervisor.

20        Q    -- written logs.

21        A    Their immediate supervisor.

22        Q    So, did the requirements of doing a formal

23    talk as well as eight interpretive logs change?

24        A    No.

25        Q    Did the Agency and the union agree on

1    standards used to review the grievances?

2        A    We, at my request, had a meeting that

3    included my associate regional director, who is the

4    ultimate decision-maker so to speak if we were to go to

5    arbitration.  We had 23 grievances.  We did not want to

6    be faced with 23 arbitrations, even though they were

7    individual and they had a right.  So we met with the

8    union to iron out where are the problems, what are the

9    differences, can we all agree we're not taking these

10    things to arbitration.  We're going to come to a fair

11    conclusion, and only if you have some real -- in other

12    words, we weren't going to take to arbitration the

13    issue of competencies versus merit promotion procedures

14    and those kinds of things.

15        If an individual had -- and they all had

16    unique circumstances.  If an individual's unique

17    circumstance warranted it going to arbitration, then we

18    agreed that it would do that.  But we didn't want to be

19    faced with 23 cases all going to arbitration over an

20    issue that we felt we could settle informally.

21        Q    Okay.  I'm going to show you what's already

22    in the record as Exhibit 3, the attachment to the

23    Agency's Motion for Summary Judgment.

24        Ms. Joy, do you recognize that memo?

25        A    It's a memo that the union steward who

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    attended the meeting, Christine Stanzack, developed in

2    order to use as a talking point for her rangers.  It

3    was not something that we contributed to.  It was not

4    something that we sanctioned.  It was something that

5    the union's allowed to do.  If you attend a meeting and

6    you want to meet with your folks, then you have a right

7    to do it whatever way you want to do it.

8         Q    And did you get a copy of the memo?

9         A    Subsequent to it being done.  I didn't review

10   it, didn't get asked an opinion.

11        Q    Were you the "Connie Joy" that's referenced

12   in -- in the meeting she refers to?

13        A    Yes.

14        Q    Okay.  And was it your understanding based

15   upon the meeting that you had with the union on

16   February 7th, 2000, that the requirements to go for

17   promotion from the 5 to the 7 was the informal

18   presentation and the formal presentation?

19        A    Yes, it was.

20        Q    And do you know what the informal

21   presentation is -- what that means?

22        A    The way they measured the informal

23   presentation was in fact the contacts that were

24   involved on the basis of what have my contacts been of

25   the day.

1     Q   Do you recall -- you've never served as a

2  ranger, is that correct?

3     A   No, I have not.

4     Q   Okay. Do you recall what was agreed to with

5  respect from going to the 7 to the 9 level?

6     A   Basically, we agreed to, you know -- the

7  educational program was mandatory. They had to perform

8  lead ranger duties, and they had to either have done a

9  walking tour, an interpretive writing assignment, or

10  some type of cultural resource program.

11     Q   Okay. And did these standards apply -- for

12  promotion apply to all rangers?

13     A   Yes, it did.

14     Q   Did it also apply to those rangers who were

15  eligible to be promoted from the 5 to the 7 in 1999?

16     A   Rephrase your question. I'm not sure what

17  you're asking.

18     Q   Okay. I'll strike that and will re-ask it at

19  another time.

20         Does the memo reflect what the Agency and the

21  union agreed upon?

22     A   Yes, it does.

23     Q   Okay. Do -- do you know what Ms. Stanzack

24  was referring to when she said "completing the site

25  checklist"?

1    A    I don't know necessarily what she was

2    referring to.  I know that the Agency has a checklist

3    and the checklist has no real -- well, it has a quasi

4    relevancy.  That checklist is used because we used

5    rangers as our eyes and ears for being able to tell us

6    whether or not there's a piece of the sidewalk that has

7    a hole in it that would be a safety issue for the

8    rangers.  That's what they put on the checklist.  Or

9    if, for whatever reason, the locks at the Lincoln were

10   jammed and we needed to worry about securing the locks,

11   or if they had to call the duty person to say the

12   elevators aren't working, or things of that nature.  It

13   was not for purposes of addressing the personal

14   contacts with the visitor that would in fact substitute

15   for your informal presentation.

16        Q    Did the union and the Agency ever put this

17   agreed-upon standard into a formal resolution agreement

18   or memorandum of understanding?

19        A    No, we did not.

20        Q    Do you know why that didn't happen?

21        A    Basically, it was an informal meeting.  There

22   was no formal issue put on the table by the union to

23   us.  It was my attempt to try to make everybody feel as

24   though there was going to be a fair, equitable

25   resolution to a problem that had existed prior to my

1    arrival, just trying to settle the grievances and move

2    forward to the future.

3        Q    After you reached this agreement, what did

4    the Agency do next?

5        A    We began to -- basically, the employees began

6    to file.  What happened was one employee stepped out

7    front.  Adam Cochran decided, I'm going to be the first

8    one.  When Adam stepped up front and filed his

9    grievance, I made a decision -- a recommendation,

10   because I was not the deciding official, but because it

11   was so heavily human resources-oriented, I made the

12   technical review on all of the human resources issues

13   and made a recommendation as to what the decision would

14   be.

15           That recommendation was made prior to this

16   meeting.  And Mr. Cochran got his decision letter, and

17   then we began to meet on these things and people began

18   -- the supervisors began to ask some questions.  And

19   they found out that technically if you're on a

20   selection certificate issued by the Office of Personnel

21   Management, you can in fact be selected and you cannot

22   do anything to change the grade level or anything on

23   the employee until after 90 days of the individual

24   having been selected off of that certificate.

25   Otherwise, it implies that you manipulated the human

1    resources system in attracting candidates.

2        Q    Okay.  You lost me.  What -- are you talking

3    about year in grade requirements?

4        A    No.  What I'm talking about is that we began

5    to deal with when people would have been eligible for a

6    promotion.  And it does tie back to time in grade, but

7    it also ties to qualifications and what kind of job

8    they were in whether or not they had promotion

9    capabilities.

10        Q    Okay.  What's time in grade to go from the 5

11    to the 7?

12        A    A year.  A year in grade -- not just a year

13    in grade, but a year in grade performing specialized

14    duties relevant to the series that you're in.  The fact

15    that you could be a Grade 5 clerk typist and spend a

16    year as a Grade 5 clerk typist and then be appointed as

17    a Grade 5 ranger would not mean that you met your year

18    in grade.  Your year in grade has to be tied to the

19    series that you're doing in order for you to meet the

20    minimum requirement of performing the specialized

21    duties of that particular job.

22        Q    So, what if a park ranger, GS-5,

23    interpretation, had served as a park ranger at another

24    park prior to moving to the Mall?  Would that time in

25    grade as a GS-5 count towards year in grade?

1       A    Yes, it would.

2                            (The document referred to was

3                            marked for identification as

4                            Agency's Exhibits 2-A through

5                            2-K.)

6            BY MS. ARMSTRONG:

7       Q    Okay.  I'm going to show you what's marked as

8  Agency Exhibits 2-A, 2-B, 2-C, -D, -E, -F, -G, -H, -I,

9  -J, -K.

10      A    (Pause)

11      Q    Do you recognize those documents?

12           JUDGE REARDON:  Do you have a copy of those?

13           MS. FROHMAN:  Can I ask what those are?

14           MS. ARMSTRONG:  Those are grievances.

15           MS. FROHMAN:  Okay.

16           MS. ARMSTRONG:  They're attached to your --

17  actually, I didn't attach them since I gave them to you

18  --

19           MS. FROHMAN:  Interrogatories?

20           MS. ARMSTRONG:  -- in discovery.  Yeah.  This

21  is Response --  here's Response Number 1 to the

22  interrogatories.  Not interrogatories, request for

23  documents.

24           (Pause)

25           MS. ARMSTRONG:  Let's make sure we're all on

1    classification.  I looked at the recommendation made by

2    the supervisor.  I looked at their OPF to determine

3    what their history was.  In other words, if an

4    individual had time in grade, I had to make that

5    initial determination.  We have many park rangers that

6    take temporary appointments throughout the National

7    Park Service because it's been difficult to get a

8    permanent job.  So they may in fact have done time in a

9    position -- particular position at Yellowstone, at

10   Shenandoah, and any number of parks before they

11   actually came to us.

12        Q    What were the supervisory recommendations

13   with respect to movement from the 5 to the 7 that you

14   needed in order to determine whether --

15        A    I needed a memorandum from the supervisor

16   attesting to the fact that the individual had

17   satisfactorily performed the duties relevant to the

18   particular grade level that they were trying to move

19   from.  Some were trying to move from the 5 to the 7.

20        Q    And what were the -- what -- what did the

21   supervisor have to recommend for the 5 to the 7?

22        A    They had to tell me that the individual had

23   satisfactorily completed the logs, that they had done

24   their informal interpretation and their formal

25   interpretation.  But they also had to tell me whether

1   or not the individual's interpersonal skills were

2   appropriate.

3       Q    Okay.  Let's look at the first one, 2-A.  Did

4   you get a supervisory recommendation from Adam -- for

5   Adam Cochran?

6       A    On December the 27th, I received a

7   recommendation from Duane Erwin, who was the

8   supervisory park ranger.  The recommendation was made

9   to Donna Donaldson.

10      Q    And did Mr. Cochran do the informal and

11  formal requirements to get promoted to the 7, based on

12  Mr. Erwin's recommendation?

13      A    He indicated that he had observed Adam

14  providing both formal and informal interpretation at

15  all the park sites that meet the National Park Service

16  standards.

17      Q    Okay.  Let's look at Agency Exhibit 1-B,

18  Jennifer Epstein.  Did you receive a supervisory --

19      A    Which one?

20      Q    Oh, I'm sorry.

21           JUDGE REARDON:  You mean 2-B.

22           BY MS. ARMSTRONG:

23      Q    2-B, I'm sorry.  Oh, I'm sorry.  Let me go

24  back.

25           Do we know what the offensive -- never mind.

1    satisfactorily and she had met her time in grade and

2    all the other requirements, so she made a

3    recommendation.  This is one of those cases that the

4    young lady wanted to be a Grade 9 instantaneously.  So

5    things just depended upon the situation.  Some of them

6    required corrections all the way back.

7        Q    Let's -- 2-D, Brian Hall.  Do you recall

8    receiving a recommendation from his supervisor for a

9    promotion from a 5 to a 7?

10        A    Duane Erwin made a recommendation on March

11    13th, 2000, that he had audited Mr. Erwin's formal

12    interpretive talk and that he was able to present

13    those.  He had also demonstrated his ability to perform

14    an informal interpretation and had in fact presented

15    it.  He even went further because this was one of those

16    cases that we were dealing with promotions all the way

17    up to the 9.  He made recommendation on retroactivity

18    as it related to the 5 and the 7 and the 9.

19        Q    Okay.  And why was he promoted from the 7 to

20    the 9?

21        A    Because in fact he had met the requirements

22    of a 7.  He had been required to develop interpretive

23    programs.  He had selected the most appropriate ways to

24    impact the information to the visitors.  He had also

25    developed pamphlets and exhibits and signs, et cetera.

1    5th, 1999.

2         Q    And do you know why that -- they used that

3    date?

4         A    That was the date where he had finally done

5    his formal and he had been audited.

6         Q    Okay.  Let's look at Agency Exhibit 2-G,

7    Matthew McNama.  Did you receive a supervisory

8    recommendation that he be promoted from the 5 to the 7?

9         A    Yes.  Duane Erwin made a recommendation --

10   made the recommendation on March 13th.  He indicated

11   that he had successfully demonstrated that he could

12   perform effective informal interpretation and also give

13   effective formal interpretive programs.

14        Q    And what -- what date did they recommend his

15   promotion be effective?

16        A    Effective May 5, 1999.

17        Q    Let's look at Agency Exhibit 2-H.

18             JUDGE REARDON:  I'm sorry.  May I interrupt

19   you one more time?  Going back to this last one, and a

20   number of them have been similar, the logs that you

21   talked about, the eight --

22             THE WITNESS:  Informal.

23             JUDGE REARDON:  -- is that what -- does that

24   come within this informal interpretation?

25             THE WITNESS:  Yes.

1    Q    Of what year?

2    A    1999.

3    Q    Okay.  And the -- the next exhibit, 2 -- 2-J.

4    A    (Pause)

5    Q    Was he recommended for promotion from the 5

6    to the 7?

7    A    Yes, he was.

8    Q    And why was --

9    A    He was recommended by Duane Erwin effective

10   9/13/99.

11   Q    And why was that?

12   A    Basically, he indicated that he had already

13   taken his formal interpretive talks and that he had

14   also achieved the national standard in presenting

15   Module 102, which is the formal interpretation module,

16   and that he performs all those duties at or above the

17   requirements of this position.

18   Q    Okay.  Finally, 2-K, and who's that?

19   A    Katherine Williams.

20   Q    And was she recommended for promotion from

21   the 5 to the 7?

22   A    Yes, she was.  Wayne Braxton was the

23   supervisor, and he recommended that she be promoted.

24   This is one of those cases where we did a lot of

25   retroactivity.  He was actually making the

DIRECT EXAMINATION

1

2        BY MS. ARMSTRONG:

3        Q    Mr. Erwin, please state your full name for

4  the record?

5        A    Duane Phillip Erwin.

6        Q    Mr. Erwin, what is your position?

7        A    I'm a chief ranger at Wolftrap National Park

8  for the Performing Arts.

9        Q    How long have you held that position?

10       A    Since March of last year.

11       Q    And what was your position prior to becoming

12  a supervisory ranger at Wolftrap?

13       A    I was a supervisory ranger on the National

14  Mall at National Capital Park Central.

15       Q    And how long were you the supervisory ranger

16  on the National Mall?

17       A    Three years.

18       Q    Would you have started in 1999?

19       A    As an acting supervisor -- at that time.

20       Q    And when did you become the permanent

21  supervisor?

22       A    In June of 2000.

23       Q    And did you ever supervise Mr. George

24  Callahan?

25       A    Yes.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    Q    And when was that time period?

2    A    In 1999 and 2000, until I left for Wolftrap.

3    Q    Mr. Erwin, do supervisors have procedures for

4    recording rangers' leave and attendance at work?

5    A    Yes.

6    Q    And can you explain to us what that procedure

7    entails?

8    A    There is a supervisory log book that is kept

9    up in the supervisor's area, and you put in it every

10   day whether someone has worked overtime or comp time or

11   used comp time or taken annual leave or has called out

12   sick or anything like that.

13   Q    And when do you begin to document when

14   someone has called out sick or taken annual leave?

15   A    The day they take the leave.

16   Q    Is there a roll call procedure at the

17   National Mall?

18   A    There's a roll call that's -- takes place

19   half an hour before the rangers go out to the site, and

20   we give them information for the -- for the day that

21   they would need.  And there's also a sign-in sheet at

22   that roll call for everybody to sign in.

23   Q    Do you have your log book at the roll call?

24   A    No, it's upstairs.  We go and fill it out

25   immediately after roll call.

1      A    It was -- I'm not -- I'm not completely sure.

2    I think it was when we were instituting his

3    performance plan.

4      Q    And were you involved in that complaint at

5    all?

6      A    No.

7      Q    When did Mr. Callahan come to you in

8    reference to promotion to the GS-7 level?

9      A    I think in 2000.

10      Q    And what did Mr. Callahan state to you with

11    respect to promotion?

12      A    That he had an agreement that all he had to

13    do for a promotion was have one year time in grade.

14      Q    And what -- you said he had an agreement.

15    What agreement --

16      A    He said that he had an agreement because of

17    his previous grievance with the Park Service that there

18    was an agreement that for him to be promoted all he

19    would have to do -- the only standard that he would

20    have to meet was the time in grade.

21      Q    And when you say grievance, did he state --

22    what did he state with respect to a grievance?  Was it

23    an EEO complaint?

24      A    The EEO complaint.

25      Q    And what was your response?

1       A    I told him that if he could show me

2  documentation that stated that that, you know, I would,

3  you know, abide by it, but other than that, he'd have

4  to meet the same criteria as all of the other park

5  rangers for promotion.

6       Q    And did you put that response in writing?

7       A    Yes.

8       Q    Okay.  I'm going to ask that you turn to ROI

9  Exhibit Number 2, page 27.

10      A    (Pause)

11      Q    Is that the memo that you wrote to Mr.

12  Callahan?

13      A    Yes.

14      Q    And where in that memo have you -- did you

15  state that there was some type of agreement, that

16  needed to provide the agreement?

17      A    (Pause)  I'm sorry.  What was the question?

18      Q    You said -- you testified that you told Mr.

19  Callahan that he would to produce an agreement.

20      A    Right.  I said, if you have any documentation

21  or endorsement relating to any other agreement made

22  with the National Park Service regarding your promotion

23  eligibility that you could give -- that you could give

24  us, Lance has assured me that it will be honored.

25      Q    And who is Lance?

159

1    A    Lance Hatten was the site manager for the

2    National Mall.

3    Q    Was he your supervisor?

4    A    Yes.

5    Q    Did you speak to him in reference to this?

6    A    Yes.

7    Q    Did you and Mr. Callahan come to an agreement

8    with respect to you meeting with him regarding the

9    requirements for promotion?

10    A    I told him that I would touch base with him.

11    Q    Were you able to do that?

12    A    No.

13    Q    Why not?

14    A    George wasn't there for me to talk to about

15    it.

16    Q    And why wasn't he there?

17    A    He was on sick leave for medical reasons.

18    Q    Was that in December -- November 2000?

19    A    Yes.

20    Q    December 2000?

21    A    December of 2000.

22    Q    Was he back in January 2001?

23    A    I don't believe he was.

24    Q    What about February 2001?

25    A    No, I don't think so.

1     Q    March 2001?

2     A    No.

3     Q    April 2001?

4     A    (Pause)

5     Q    Let's look at RCI Exhibit 23, page 93 through

6  95.

7     A    (Pause)

8     Q    Was he there in March 2001?

9     A    He has that he was out on sick leave that

10  whole pay period.

11     Q    What about -- what did that -- when you're

12  referring to pay period, is that March 11th through --

13     A    March 11th through March 24th.

14     Q    What about the next pay period?

15     A    March 25th through April 7th, he was gone on

16  sick leave.

17     Q    What about the next pay period?

18     A    March -- I'm sorry, April 8th through April

19  21st he was on sick leave and then on leave without pay

20  -- yeah leave without pay.

21     Q    Okay.  Based upon your knowledge, prior to

22  2000, did management ever discuss with Mr. Callahan the

23  requirements for promotion?

24     A    Yes.

25     Q    And how were rangers informed of the

1    requirements for promotion prior to 2000?

2        A    It would be gone over with you during your

3    performance plan institution, and also the chief of

4    interpretation came down and talked to us during roll

5    call several times.

6        Q    Let's look at -- you said during performance

7    standards?

8        A    Right, performance standards.

9        Q    Can you turn with me to ROI Exhibit 15?

10        A    (Pause)

11        Q    Can you -- are these the performance

12    standards for Mr. Callahan?

13        A    Yes.

14        Q    And do you recognize page 3 of Agency -- I

15    mean, ROI Exhibit Number 15-B?

16        A    Yes.

17        Q    Can you tell us what that is?

18        A    It's a worksheet that you -- several of the

19    rangers go over with their -- their supervisor as to

20    what they need to do towards completing the

21    competencies for interpretation.

22        Q    Okay.  And let's go over that.  What were the

23    requirements for -- when were the competencies

24    initiated by -- based on your recollection?

25        A    In 1995.

162

1     Q   And what were the requirements for promotion

2  under the competencies?

3     A   Under the competencies you had to --

4     Q   From the 5 to the 7.

5     A   From the 5 to the 7 you had to have the

6  Module 102 and 103 certified.  One is a formal

7  interpretive program and the other is an informal

8  interpretive log.  And those had to be sent to -- sent

9  in to the -- the certifiers at Harper's Ferry and

10  certified to be promoted.

11     Q   Okay.  Now, what happened -- when did the

12  competencies no longer exist?

13     A   They still exist, but for our promotion needs

14  I believe after the -- the grievance that the -- the

15  union had with the Park Service, after that was

16  cleared, you still had to do the same competencies for

17  promotion but your supervisor could sign off on the

18  competencies and have -- instead of having them

19  actually sent off and actually certified.

20     Q   And prior to -- was this standard, this

21  performance standard, page 3 of Agency 15-B, was this

22  instituted when the competencies were in place?

23     A   Yes.

24     Q   Okay.  And does that -- is that what that

25  means, "Goal -- Goal 3, produce tape"?

1      A    Yes.

2      Q    "And submit or try again"?

3      A    Yes, because you had to produce a videotape

4    of your -- of your interpretive talk to send out for

5    other people to view and judge whether or not it met

6    the criteria.

7      Q    And was that -- was this given to Mr.

8    Callahan when his performance standards were given,

9    based on --

10     A    Yes.

11     Q    And did you rate Mr. Callahan in 1999?

12     A    Yes.

13     Q    Is that your signature on page 4?

14     A    Yes.

15     Q    I'm sorry, 14-A.

16     A    (Pause)

17     Q    And did you give him an "achieved"?

18     A    Yes.

19     Q    Why?

20     A    He was performing at the grade level of a GS-

21   5 satisfactorily, I thought.

22     Q    Had he met the requirements to go from the 5

23   to the 7, to your knowledge?

24     A    No.

25     Q    And why not?

1    A    He had not produced any informal logs and he

2    had not done the -- the program, the formal

3    interpretive program.

4    Q    Okay.  Let's talk about that.  What's the

5    formal interpretive talk?

6    A    The formal interpretive talk is given at one

7    of the sites on the National Mall, and it uses the

8    criteria that the National Park Service has as a

9    standard for interpretation to raise the level of

10   appreciation that the visitor has of the site, giving

11   them an emotional or an intellectual connection with

12   the -- the site.

13   Q    And what about the logs?  Can you explain

14   those to us?

15   A    The logs are similar.  You write a series of

16   eight different logs or vignettes, just interactions

17   you've had with a visitor that when you -- while you

18   were talking to them, you brought them up to a level

19   where they had a better appreciation through an

20   emotional or an intellectual connection that they made

21   through -- to the site through you talking to them.

22   Q    Okay.  Are these written?

23   A    They're written.

24   Q    Are they typed?

25   A    Yes.

1    Q    And are these independent projects?

2    A    Yes.

3    Q    Can you write a log for a ranger?

4    A    Can I write one for a ranger?

5    Q    Right.

6    A    It wouldn't be ethical, but I could.

7    Q    Let's talk about page 3, Agency Exhibit 15-A.

8    I note that it says, "Supervisor will provide

9    training, review, advice, and research." How does a

10   supervisor do that? What would it require?

11   A    Basically, talking to them about what's

12   involved with the -- the process, giving them time to

13   do research, the access to the library on the Mall and

14   going to other libraries in the city and using their

15   resources for research, to give them time to work on

16   their -- their projects.

17   Q    And were these logs and the formal talk

18   requirements in '99?

19   A    Yes.

20   Q    Were they requirements in '98?

21   A    Yes.

22   Q    Were they requirements in '97?

23   A    I believe so.

24   Q    Did Mr. Callahan perform a successful formal

25   interpretive talk in 1999?

1       A    No.

2       Q    I'm going to -- what does it take to perform

3    a successful interpretive talk?

4       A    You have to give a program that, in the

5    judgment of your supervisor, brings the visitor to a

6    better appreciation of the resource by bringing them to

7    a -- a greater intellectual or emotional connection to

8    the resource.

9       Q    Mr. Erwin, were you aware that Mr. Goring had

10   reviewed Mr. Callahan's interpretive talk in 1998?

11      A    Yes.

12      Q    And did he meet the requirements to pass at

13   that time?

14      A    No.

15      Q    Why not?

16      A    There's nothing showing that he did.  In

17   fact, the critique that I've seen that Lauren wrote

18   basically gives him -- it's a critique and that's all

19   it is.  It doesn't indicate in any way that he gave a

20   successful talk.

21      Q    And was every ranger subject to the same

22   requirements for promotion, to your -- the best of your

23   knowledge?

24      A    Yes.

25      Q    Mr. Erwin, let's talk about -- are there log

1    books at each site of the Mall?

2         A    Yes.

3         Q    And can you tell us what their purpose is?

4         A    The log books at the site basically record

5    who was on duty at that site that day, any special

6    events that would have taken place there, any Park

7    Police activity, or anything out of the usual.

8         Q    Does completing the log book at each park

9    site, is that the same thing as the informal log?

10        A    No, that's completely different.

11        Q    Okay.  And what's the difference?

12        A    The log books at the site are a record of the

13   events of the day.  They're not any kind of writing

14   about an interpretive experience that you had with a

15   visitor.

16        Q    Have you recommended the promotion of certain

17   rangers from the GS-5 to the GS-7 during the time you

18   were at the Mall as a supervisor?

19        A    Yes.

20        Q    And what did you base that -- those

21   promotions on?

22        A    On them having year in grade and their

23   successful completion of the formal interpretive

24   program and the informal interpretive logs.

25        Q    Okay.  These are already in evidence under

171

1     Q   And in 2000?

2     A   I'm not sure. I believe he was audited in --

3  I don't believe he was in 2000, no.

4     Q   All right. Do you remember when you

5  testified before the investigator, and this is -- your

6  testimony is Exhibit 6, and I'm referring to page 9

7  where the investigator was asking you about the fact

8  that you said -- well, you had testified that you would

9  try to get out -- he talked about being ready for a

10  talk. This is Line 6:

11          "I told him that I would try to get out to

12          audit a talk, which I was not able to do

13          basically, for the most part, because he was

14          gone so much."

15     And then the investigator asked you to

16  elaborate, and you said he'd been ill so he's missed

17  periods of work. Extended -- then, Line 15:

18          "Extended periods, but I'm sure there are

19          times that I probably could have gone out and

20          audited his talk, but it just never

21          happened."

22     Now, could you elaborate on that? It never

23  happened during 2000?

24     A   No. We just did not schedule a time for me

25  to go out and see one of his talks. That, and just

1      Q    Okay. But you really didn't know whether he

2    had done the things in his plan that would have been

3    laid out?

4      A    I -- when I talked to him, when I signed off

5    on it, he said that he had been working towards

6    achieving things.

7      Q    The competencies you said remained in effect.

8    I believe you testified to that, that the competencies

9    remained in effect but they were incorporated in an

10   agreement with the union?

11             MS. ARMSTRONG:  Objection.

12             MS. FROHMAN:  I'm sorry.  Whatever he said.

13   He did say the competencies.

14             JUDGE REARDON:  I'm going to overrule the

15   objection.  Please answer the question, if you can.

16             THE WITNESS:  Okay.  I think what you're

17   referring to is, I said the competencies still exist.

18   The rangers can still go out and become certified in

19   these different modules.  But for promotion, you do not

20   have to be certified.  That's the only difference.  You

21   don't have to be certified.  You have to -- to be able

22   to do them to the satisfaction of your supervisor.

23             BY MS. FROHMAN:

24      Q    Are you familiar with -- it's a letter at

25   page 4 of Exhibit 12 of the record, and it's from the

1    testimony, Mr. Erwin.

2            THE WITNESS:  Thank you.

3            JUDGE REARDON:  Please do not discuss your

4    testimony with anyone other than your counsel outside

5    of this hearing room.  Thank you.

6            (Whereupon, the witness was excused.)

7            JUDGE REARDON:  Let's go off the record,

8    please.

9            (Pause)

10           JUDGE REARDON:  Ms. Armstrong, would you

11   please call your next witness?

12           MS. ARMSTRONG:  Suzanne Kelley.

13           JUDGE REARDON:  Ms. Kelley, would you please

14   raise your right hand?

15   Whereupon,

16                   SUZANNE MARIE KELLEY

17   having been first duly sworn, was called as a witness

18   herein and was examined and testified as follows:

19                   DIRECT EXAMINATION

20           BY MS. ARMSTRONG:

21       Q   Ms. Kelley, please say your full name for the

22   record.

23       A   Suzanne Marie Kelley.

24       Q   Ms. Kelley, where do you work?

25       A   I currently work at John Heinz National

1    Q    Mr. Hatten, where do you work?

2    A    I'm -- I work at National Capital Park

3    Central.

4    Q    And what's your position?

5    A    I'm currently the deputy administrative

6    officer for National Capital Park Central.

7    Q    And how long have you held that position?

8    A    I've held this position since June of 2003.

9    Q    Prior to June 2003 --

10   A    Yeah.

11   Q    -- can you tell me what position you held

12   prior to that?

13   A    Yes.  Beginning in July of 2000, I was the

14   site manager for National Mall Operations.  I remained

15   the site manager from July of 2000 up until January of

16   2003.

17   Q    And what were your job duties as site manager

18   for the National Mall?

19   A    I was responsible for the rangers who staffed

20   the sites which comprised the memorial core of

21   Washington, D.C., which would include the Washington

22   Monument, Korean War Veterans Memorial, the Lincoln

23   Memorial, the Thomas Jefferson Memorial, and the other

24   historic sites and landscapes.

25   Q    Was there ever a time that you were a park

248

1                    REPORTER'S CERTIFICATE

2

3              This   is   to   certify   that   the   attached

4    proceedings before:

5                    UNITED STATES OF AMERICA
6           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
7    In the Matter of:

8                    GEORGE CALLAHAN
9                         VS.
10                   GALE A. NORTON

11   were   held   as   herein   appears   and   that   this   is   the

12   original   transcript   thereof   for   the   file   of   the

13   Department,  Commission,  Board,  Administrative  Law  Judge

14   or the Agency.

15              Further,  I  am  neither  counsel  for  or  related

16   to any party to the above proceedings.

17

18

19                        *Stan Ruddie*
20                        Official Reporter

21   Dated:    February 9, 2004

22