**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

| | |
|---|---|
| GEORGE CALLAHAN,  )<br>Complainant, )<br>)<br>v. )<br>)<br>GALE NORTON, SECRETARY )<br>DEPARTMENT OF THE INTERIOR )<br>)<br>Agency. )<br>) | EEOC No.100-A1-7992X<br><br><br><br>Agency No. FNP-2001-018<br><br><br>Date: March 4, 2004 |

## ORDER ENTERING JUDGMENT

For the reasons set forth in the enclosed Decision dated March 4, 2004, judgment in the above-captioned matter is hereby entered. A Notice To The Parties explaining their appeal rights is attached. This office is also enclosing a copy of the hearing record for the Agency EEO office.

This office will hold the report of investigation and the complaint file for sixty days, during which time the agency may arrange for their retrieval. Please contact Kimberly Byrd at (202) 275-6635. If we do not hear from the Agency within sixty days, we will destroy our copy of these materials.

It is so **ORDERED**.

For the Commission:

*Leigh A. Reardon*
Leigh A. Reardon
Administrative Judge
Telephone: (202) 275-6713
Facsimile:  (202) 275-6834

Enclosures



## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing decision within five (5) calendar days after the date it was sent *via* first class mail. I certify that on March 4, 2004, the foregoing decision was sent *via* first class mail or facsimile, as set forth below, to the following:

*Patricia Armstrong*
*Department of the Interior*
*Office of the Solicitor*
*Division of General Law*
*1849 C Street, NW MS 6530*
*Washington, DC 20240*

*A Patricia Frohman, Esq.*
*4832 46th Street, NW*
*Washington, DC 20016*

*George Callahan*
*P.O. Box 65434*
*Washington, D.C. 20035*


_____
Leigh A. Reardon
Administrative Judge

## NOTICE TO THE PARTIES

*TO THE AGENCY:*

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

*TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

## *WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

### BY MAIL:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848
Washington, D.C. 20036

### BY PERSONAL DELIVERY:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
1801 L Street, NW
Washington, D.C. 20507

### BY FACSIMILE:

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

| | |
|---|---|
| GEORGE CALLAHAN, Complainant, | ) EEOC No.100-A1-7992X ) ) |
| v. | ) ) |
| GALE NORTON, SECRETARY DEPARTMENT OF THE INTERIOR | ) Agency No. FNP-2001-018 ) ) |
| Agency. | ) Date: March 4, 2004 ) |

**DECISION**

    The record before me consists of the hearing transcript (T), the Report of Investigation (ROI) for the formal complaint, and briefs filed by the parties. All of the procedural requirements set forth in the regulations at 29 C.F.R. §1614.101 (2003), et seq. were met.

I. **PROCEDURAL HISTORY**

    On December 1, 2000, George Callahan (Complainant) filed a formal complaint of discrimination against the National Park Service, Department of the Interior (Agency), alleging discrimination on the basis of reprisal. On or about June 15, 2001, the Agency completed its Report of Investigation. The Agency accepted two issues for processing -- whether Complainant was discriminated against on the basis of reprisal when: (1) he was denied promotions on October 19, 1999, and October 20, 2000; and (2) he was placed on absent without leave (AWOL) which led to his wages being garnished on February 28, 1999 and, most recently, on September 22, 2000.

    On August 7, 2001, Complainant requested a hearing. On or about March 28, 2002, the Agency filed a Motion for Summary Judgment. On April 17, 2002, Complainant filed its Opposition to Agency's Motion for Summary Judgment. Administrative Judge Joel Kravetz denied the Agency's motion. On January 22, 2004, a prehearing conference was conducted by Judge Kravetz, wherein the parties refined and stipulated to the issues to be presented at hearing (see below). A hearing on those issues was conducted by the undersigned on February 3, 2004.

1

II. **ISSUES**

The issues before me now, as agreed to during the prehearing conference, are:

Whether Complainant was discriminated against on the basis of retaliation for prior EEO activity when:

(1) he was not promoted to a GS-7 on or around October 19, 1999, and October 20, 2000; and

(2) he allegedly had his wages improperly offset during the latter part of 2000.

III. **FACTS**

A. *Failure to promote to GS-7 and GS-9*

Complainant, George Callahan, is employed by the National Park Service, National Capital Region, National Capital Parks-Central, Mall Operations (NPS) as a Park Ranger (Interpretation), GS-0025-5. (Stipulation 1; T. 7). Complainant began working with the NPS as a volunteer in 1991. (T. 15). In 1994, he was hired as a seasonal Park Ranger. (T. 16, 19-20). After the 1994 season ended, he resumed his work as a volunteer. (T. 16). Subsequently, Complainant applied for a position as a GS-4 Park Ranger, but was not selected. (T. 21). Complainant attributed his non-selection to discrimination based on age and filed a complaint with the EEOC. (T. 21). In June 1998, Complainant's age discrimination complaint was resolved through a settlement agreement awarding Complainant a position as an Interpretative Park Ranger, GS-4, and $15,000. (ROI, Exh. 13; T. 22-24). Contemporaneously with Complainant's settlement discussions, the NPS was moving to make Interpretative Park Ranger positions into professional career ladder positions.[1] (T. 78-79, 194). Complainant's counsel and Agency's counsel had an understanding that acceptance of the settlement agreement would result in Complainant being promoted to a grade GS-5 after 90 days as a GS-4 and placed in the career ladder Interpretative Park Ranger 5/7/9 series. (ROI, Exh. 11, p. 26; T. 24-25, 50). In accordance with the settlement agreement, Complainant was appointed as a GS-4, Step 4, on July 20, 1998. (ROI Exh. 13-A; T. 27). Ninety days later, on October 20, 1998, consistent with his attorney's understanding, Complainant was promoted to Interpretative Park Ranger, GS-0025-5, a career ladder position. (ROI, Exh. 13-B; T. 79).

Complainant was first evaluated as a GS-4 Park Ranger for the period July 20, 1998 through September 30, 1998. (T. 54). His evaluation stated that Complainant "achieved" the

---

[1] Indeed, those rangers who had been hired at the time of Complainant's non-selection for a GS-4 position were subsequently placed into GS-5/7/9 career ladder positions. (T. 78-79).

2

critical results of his "Performance Plan." (ROI, Exh. 15-B; T. 27, 175). The evaluation also included a "Performance Agreement to Achieve & Maintain Competency at the GS-04 Level." Goal 2, "Start collecting [eight] interpretive contacts for the Informal Interpretation Log, and Goal 3, "Produce tape for Formal Interpretation (103) Assessment," were rated as "not applicable" at the GS-4 level. (ROI, Exh. 15-B). Nonetheless, Complainant gave a formal interpretative talk as a GS-4, which was audited by his then supervisor Lauren Goring. (ROI, Exh. 12; T. 55).

Upon becoming a GS-5 in October, 1998, Complainant was told that he was supposed to give an interpretive talk audited yearly by his supervisor. (T. 29). He was also told that compiling logs was something that "should be done." (T. 29, 73).

In 1999, Complainant was diagnosed with cancer and began undergoing aggressive therapy. (T. 44). As a result of his illness and treatments, Complainant was absent from work for a large part of 1999 and 2000 ( approximately 60% of the time). (T. 44, 63; ROI Exhs. 22-23). He returned to work in July 2000, but was absent periodically, and missed another extended period of time from December 2000 through at least April, 2001.[2] (T. 45, 69, 197). Complainant's prolonged absences were accounted for by a combination of sick leave, annual leave, and leave without pay.[3]

Complainant received a second evaluation covering the period October 1, 1998 through September 30, 1999. (ROI, Exh. 15-A). Like his first evaluation, the second evaluation stated Complainant had "achieved" the critical results of his "Performance Plan." (T. 31, 176). Similar to the first evaluation, the second evaluation included a "Performance Agreement to Achieve & Maintain Competency at the GS-05 Level." This evaluation stated that Complainant's progress toward meeting Goal 2, "Start collecting [eight] interpretive contacts for the Informal Interpretation Log," would be reassessed after module 101 training was completed, and that Goal 3, "Produce tape for Formal Interpretation (103) Assessment," was to be completed by December 31, 1998. At the end of the rating period, his then supervisor, Duane Erwin, noted that Complainant "Does good job. Has been out sick the majority of the year." (ROI, Exh. 15-A; T. 51, 182). At that time, Complainant told Erwin that he was working on the formal and informal presentations. (T. 177, 181).

---

[2] The time and attendance sheets in the record stop after April 2001. (ROI, Exh. Nos. 22, 23).

[3] Apparently due to some lapses in submitting the required documentation in a timely manner, Complainant was charged AWOL on a number of occasions. These AWOL charges, in part, prompted the instant complaint. Prior to hearing, however, the Agency represented that it had reviewed all of Complainant's Absence Without Leave records and corrected all AWOL charges during the calendar periods of 1999-2001 to Leave Without Pay. Agency Exh. 1. Accordingly, no AWOL issue was litigated.

3

A career ladder position does not result in automatic promotions. (T. 116). To be promoted from a GS-5 to a GS-7 Interpretative Park Ranger, a Ranger must meet certain Agency requirements. Rangers were informed of these requirements during discussions of their performance plans; also, the Chief of Interpretation outlined the requirements several times during roll call. (ROI Exhs. 15A-B; T. 160-161, 173-175, 190). Prior to approximately 1999, a Ranger had to successfully complete "competencies," including a formal presentation and eight informal interpretative logs. (T. 87-88, 162). Both the formal presentation and the informal interpretative logs had to be sent to, and certified by, an agency official at Harpers Ferry. (T.89-90, 162). Promotions were often delayed because tapes were lost en route to Harpers Ferry, or because of a lack of personnel to review and certify the tapes. (T. 82, 113, 189). The plagued promotion process prompted the Park Ranger's Union to present more than twenty individual grievances to the Agency challenging the competency requirement. (T. 81, 91, 189; Agency Exhs. 2a-2k). Complainant was not among the grievants.

On February 7, 2000, Union representative, Christine Stanczak, and Agency representative, Consuella (Connie) Joy, met to discuss the issues raised by the competency requirements, and to identify the requirements necessary for promotion from one grade to the next. (T. 91, 123-24). No global resolution was committed to writing (T. 94, 124); however, Stanczak memorialized her understanding of the meeting in a memo to all Park Rangers. Stanczak's memo indicates that the parties agreed that, to be promoted from the GS-5 to the GS-7 level,[4] a Ranger must have served one year performing relevant duties at the GS-5 level;[5] possess sound interpersonal skills; and demonstrate that they had completed an informal presentation (consisting of eight site logs), a formal presentation, and site checklists. Certification is encouraged, but not mandatory. (Agency's Motion for Summary Judgment, Exh. 3; T. 87-89, 92-96, 116, 124-125, 201-202). The difference between the agreement reached by the parties and the "competencies" was not one of substantive requirements; the difference was that the supervisor, rather than a certifier in Harpers Ferry, could review and approve the work (T. 89-90, 118-119, 129, 162, 177-179, 188-190, 202). The memo also states that Joy would be meeting with supervisors to determine whether an employee had met the promotion requirements. (Agency's Motion for Summary Judgment, Exh. 3). Each individual grievant ultimately received a letter addressing his particular circumstances within the context of the

---

[4]To be promoted from the GS-7 level to the GS-9 level, rangers, at a minimum, have to serve one year at the GS-7 level, and perform lead ranger duties, an educational program, and either a walking tour, interpretive writing assignment, cultural resource program or resource management program. (T. 93).

[5]According to the agreement, time-in-grade included seasonal time at the GS-05 level or above in the ranger 0025 series; however, park guide time did not count towards time-in-grade. (Agency's Motion for Summary Judgment, Exh. 3).

4

understanding between the parties.[6] For most of the grievants, the result was that they received a retroactive promotion based upon their supervisor's recommendation and representation that the employee had appropriate interpersonal skills and had satisfactorily provided formal and informal interpretation.[7] (Agency Exhs. 2a-2k; T. 100-113, 203-204). Complainant's supervisor recommended promotion from GS-5 to GS-7 for those employees he supervised who had met the time-in-grade requirement, and completed the eight logs and the formal interpretative talk. (T. 101, 104, 108, 112, 167-169; Agency Exhs. 2a, 2d, 2g, 2j). After the grievances had been resolved, supervisors were encouraged to meet with those employees, who met the time-in-grade requirements but not the promotion requirements, in an effort to move those employees forward. (T. 121- 123).

Despite having served his time-in-grade requirement, Complainant did not receive a career ladder promotion to the GS-7 level in October 1999 (Stipulation 3).[8] At that time, Complainant had not met the promotion requirements to move from a GS-5 to a GS-7. (T. 163-165, 181). Nor did Complainant complete the informal and formal interpretation requirements in 2000. (T. 170).

---

[6]In a memo dated December 20, 1999 to Ranger Cochran, the Regional Director of the National Capital Region stated:
> The issue of eligibility for promotion has been discussed within the National Capital Region and with staff in the National Park Service Washington Office. There was a misunderstanding over whether or not an employee must meet the competencies and be certified in order to be promoted from a GS-5 to a GS-7 and similarly to the GS-9 level. While it is highly desirable that employees achieve the competencies, it is not a requirement for a promotion. An employee must meet the Office of Personnel Management X-118 qualification standards and have worked 1-year at the next lower level in order to qualify for a promotion....If an employee meets the X-118 qualification standards and has demonstrated the ability to perform at the next higher grade, he/she is eligible for a promotion.

(ROI, Exh. 12, p. 4; T. 34).

[7]"Informal interpretation" refers to the Module 102 requirements that a ranger submit a written log demonstrating eight informal contacts with park visitors. (Agency Exh. 2A; ROI, Exh. 15-A; T. 108-109, 125, 169). The purpose of the logs is to demonstrate that a ranger enhanced a visitor's park experience. (T. 164-165, 191, 202-203). These logs are not synonymous with park log books, which are located at each site and use to record necessary repairs, special events, or unusual activity (T. 94, 114-115, 130-131, 167, 193).

[8]As of the date of the hearing, Complainant still had not been promoted beyond the GS-5 level.

5

Duane Erwin, Supervisory Park Ranger, was Complainant's immediate supervisor during the relevant time period. (T. 140-141). Complainant, after he had been a GS-5 for a year, and apparently laboring under the impression that his settlement agreement entitled him to an automatic promotion upon completion of his time-in-grade requirement, asked Erwin why he had not yet been promoted. (ROI, Exh. 5, p. 7-9; ROI Exh. 6, p. 7; T. 31, 80, 157, 185, 201, 243). Erwin told Complainant that he would look into it. (ROI, Exh. 5, p. 7; T. 31). Erwin consulted both with Suzanne Kelley, then Acting Site Manager, and her successor, Lance Hatten, and subsequently told Complainant that if Complainant produced documentation showing that his settlement provided for promotion without having to meet the Agency's standard requirements for promotion, the Agency would honor the agreement. (ROI Exh. 2, p. 27; T. 158, 184-186, 196-197, 200-201, 205-207). Complainant never produced such documentation because it did not exist. (T. 201, 244).

In August, 2000, Complainant consulted an EEO counselor. (ROI, Exh. 2). In a memorandum to Complainant dated November 19, 2000, prompted by his requests and by management's directive to supervisors, Erwin reiterated the requirements for promotion and agreed to meet with Complainant on or before December 14, 2000. (ROI Exh. 2, p. 27; T. 60, 121-123, 126-129). On December 1, 2000, Complainant filed his formal EEOC complaint. (ROI, Exh. 1; T. 40). Erwin did not meet with Complainant in December as specified by the November memo because Complainant was subsequently absent from work through at least April 2001. (ROI, Exh. 23, pp. 87-95; T. 159-160).

Sometime in 2000, Erwin asked Complainant about scheduling a time to audit Complainant's formal interpretative talk. (T. 36). Complainant had replied that Erwin was welcome to audit one of his talks "any time he felt like it," (T. 37, 172), but Erwin testified that he did not get around to it, due to the fact Complainant was out so much. (ROI, Exh. 6, p. 9; T. 171). Erwin also personally talked to Complainant about what he needed to do with regard to the informal logs and provided Complainant with examples of what others had done. (ROI, Exh. 6, p. 9). Since the filing of this complaint, in May 2002, Complainant successfully completed his formal interpretative program. (Comp. Exh. 1; T. 38, 56, 207-210). However, Complainant admits that he has never completed the informal interpretative program (eight informal logs). (T. 52).

B.  *Deductions from pay*

As stated above, Complainant missed extended periods of work during 1999 and 2000. Complainant was occasionally and erroneously paid for time he was not at work, including being paid a night differential. (See, e.g., T. 143-156; ROI, Exh. 23, pp. 49-50, 72-73; Agency Exhs. 5, 6). Accordingly, Complainant's time and attendance sheets were amended to correct the errors. (ROI Exh. 23, pp. 3-5; T. 154, 216-217). On January 27, 2000 and March 21, 2000, the Agency sent Complainant notices informing him that the Agency would be offsetting his pay to correct the time sheet errors. (T. 219-222). Offsets were made to correct for time the payroll records had originally shown Complainant to have been at work when, in fact, he was not

6

(including night differential pay); to recoup healthcare premiums paid by the Agency while Complainant was in a nonpay status; and to account for interest, reduced taxes, and penalty fees (T. 46, 63, 215-219, 222-229, 233). Under the Debt Collection Improvement Act, the Agency was permitted to deduct money from Complainant's pay. (T. 212-213, 222, 228).

IV.   **PARTIES' POSITIONS**

A.   *Complainant's Position*

Complainant argues that he has established a prima facie case of discrimination and that the Agency has not met its burden of showing a legitimate, nondiscriminatory reason for its failure to promote him. Complainant argues that he completed his time-in-grade requirement (for a GS-5 to a GS-7) in October, 1999, with a satisfactory performance evaluation, and that, despite repeated requests from Complainant about his promotion to the next grade, the Agency failed to advise him of any promotion requirements until he had been in grade for over two years and had consulted an EEO Counselor. Complainant concedes that there was some debate at the end of his first year as to whether "competencies" were required for promotion, but argues that the debate was resolved with the decision, documented in December, 1999, that "competencies" were not a requirement for promotion. Complainant further argues that the Agency's asserted reason at hearing for not promoting Complainant, that he did not meet the promotion requirements (eight informal logs and formal talk), fails because those requirements did not exist in October, 1999; rather, those requirements were put in place as part of the agreement in February, 2000, to resolve the Union grievances. Complainant emphasizes that this agreement was not reduced to writing, and the Union steward's memo to the grievants memorializing her understanding of the agreement, while referencing an informal interpretative program, did not specifically reference eight logs as being a requirement for promotion. Finally, Complainant argues that the pretextual nature of the Agency's asserted reason is demonstrated by its shifting positions during the investigation and hearing as to why Complainant was not promoted.[9]

Alternatively, Complainant argues that, even had the purported requirements for promotion been effective at the time Complainant had served his time-in-grade, the Agency failed to give Complainant both the opportunity necessary to fulfill those requirements, and the same level of attention it gave other rangers in evaluating their potential for promotion. In this regard, Complainant emphasizes that Erwin did not give Complainant the memo specifically outlining the promotion requirements until November of 2000, and that, although Complainant had invited Erwin to audit his talks anytime, Erwin failed to do so until May, 2002. Complainant

---

[9]In this regard, Complainant points to Joy's claim during the investigation that Complainant had not been promoted because management had been unable to evaluate him due to his extended absences (ROI, Exh. 2, p. 5), as juxtaposed with Hatten's testimony during the investigation that Complainant's absences had not adversely affected any consideration of his promotion (ROI, Exh. 7, p. 12).

7

argues that this treatment starkly contrasts to the guidance and attention given other rangers, and demonstrates the Agency's motivation to make Complainant "establish a right to be promoted by virtue of his EEO settlement." (Complainant's Brief, p. 16).

Regarding the salary offsets, Complainant argues that he received two offsets for the time period December 19, 1999 to January 1, 2000. Complainant testified that he recalled being at work during that time period, and noted that the Agency did not produce the sign-in sheets for that period.[10] Moreover, Complainant testified that he did not recall ever receiving a letter regarding the second offset for that period as would have been required under the Debt Collection Improvement Act. Finally, Complainant argues that the offset for the period August 27, 2000 through September 9, 2000, was based on a report that Complainant took sick leave on September 7 and 8; however, Complainant's leave record shows that no leave was taken by him during that period. (ROI, Exh. 22, p. 2).

B. *Agency's Position*

The Agency argues, first, that Complainant has not established a prima facie case of reprisal discrimination. Citing Stephan v. Secretary of Treasury, EEOC Case No. 05950162 (September 6, 1996), the Agency argues that Complainant has not established the fourth element of a prima facie case, namely, that the "adverse action followed [complainant's] protected activity within such a period of time that a retaliatory motivation may be inferred." The Agency contends that Complainant's original EEO activity occurred in 1997-1998, more than one year prior to his nonpromotion and almost two years prior to the pay offsets, too long a period of time to make a necessary causal connection.

Alternatively, the Agency argues that, even had Complainant proved a prima facie case of retaliation discrimination, the Agency has articulated a legitimate, nondiscriminatory reason for its actions. First, with respect to the promotion, the Agency argues that it has established that Complainant did not meet the requirements for promotion (completion of a formal talk and eight informal logs) in either 1999 or 2000. The Agency argues that Complainant's professed ignorance of the promotion requirements is not credible. The Agency further contends that Complainant's attempt to shift the blame to the Agency for the delay in having his talk audited is disingenuous -- that any delays in auditing Complainant's talk were due to his prolonged absences from work, not retaliation. Second, with respect to the offsets, the Agency argues that it had the right, under the Debt Improvement Act, to recoup wages erroneously paid to Complainant, and health benefit premiums erroneously paid on Complainant's behalf, for time he did not work. The Agency concludes that Complainant's rebuttal, consisting simply of his testimony that he recalled being at work during the pay period for which his wages were offset (T. 48), must fail in the face of contrary documentary and testimonial evidence. (ROI, Exh. 2, p. 23; ROI, Exh. 24, pp. 4, 13).

---

[10]The Agency did produce the supervisor logs for that period, which showed Complainant as absent. (Agency Exh. 5).

8

## V. ANALYSIS

Absent direct evidence of discrimination, a complainant must initially establish a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of discrimination on the basis of retaliation, Complainant must show that: (i) he engaged in a protected activity; (ii) the Agency was aware of his protected activity; (iii) he was subsequently subjected to adverse treatment by the Agency; and (iv) a nexus exists between the protected activity and the adverse action. Webster v. United States Postal Service, 1986 WL 635192 (July 1, 1986); Chappell v. United States Postal Service; EEOC No. 01963588 (May 15, 2001); O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001); Hochstadt v. Worcester Foundation for Experimental Biology, 425 F. Supp. 318, 324 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976).

If the complainant succeeds in establishing a prima facie case, the burden shifts to the agency to articulate a legitimate, nondiscriminatory reason for the challenged actions. Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 802.[11] If the agency meets that burden, the prima facie inference drops from the case. Hicks, 509 U.S. 502, 507, 510-11. Complainant then must prove by a preponderance of the evidence that the proffered explanation is but a pretext for unlawful discrimination. Id., at 511; Burdine, 450 U.S. at 256; McDonnell Douglas, 411 U.S. at 804. A finding of pretext may be based on the elements of the *prima facie* case and a determination that the employer's explanation is not credible. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-147 (2000); Hicks, 509 U.S. at 511. However, the ultimate burden of persuading the trier of fact that the agency intentionally discriminated against the complainant remains at all times with the complainant. Hicks, 509 U.S. at 511; United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983).

In its Post-Hearing Brief, the Agency now argues that Complainant has not established a prima facie case of reprisal discrimination. This position is contrary to the position it took in its Motion for Summary Judgment, where the Agency conceded that Complainant had established a *prima facie* case of retaliation discrimination, at least with respect to his nonpromotion. There, the Agency admitted that Complainant engaged in protected activity (his prior EEO suit); that his supervisor was aware of that activity;[12] that Complainant was not promoted; and that the timing

---

[11] The employer's burden is one of production, not persuasion; it must articulate a valid reason for its decision, but cannot be held to the "almost impossible burden of proving 'absence of discriminatory motive.'" Ramos v. Roche Products, Inc., 936 F.2d 43 (1st Cir. 1991), cert. denied, 502 U.S. 941 (1991).

[12] For purposes of its Summary Judgment motion, the Agency assumed that Erwin knew about Complainant's EEO activity before his eligibility for promotion. I make the same

9

of his nonpromotion, within one year of the date of the settlement agreement, was such as to allow the inference of a retaliatory motive. Here, however, the Agency contends that the fourth element is not met, arguing that the more than one year time span between Complainant's original EEO activity and his subsequent nonpromotion is too great to allow an inference of discrimination.

I find that Complainant established a prima facie case of retaliation discrimination. Supervisor Erwin testified that he did not become aware of Complainant's prior EEO activity until Complainant informed him of it, sometime, he thought, in 1999, in conjunction with establishing Complainant's performance plan (T. 156-157). Crediting this testimony, I find that Complainant's nonpromotion occurred within one year of Erwin's gaining knowledge of Complainant's prior EEO activity, a time span short enough, according to Stephan, cited by the Agency, to infer discrimination. Under this rationale, a prima facie case of discrimination could also be established as to the salary offsets, which would then be merely a continuation of a pattern of retaliation which began with the nonpromotions.

Having found that Complainant established a prima facie case of retaliation discrimination, the burden shifts to the Agency to articulate a legitimate, nondiscriminatory reason for the challenged action. The Agency needs only to produce evidence to allow a judge to rationally conclude that the action was not based on unlawful discrimination. Burdine, 450 U.S. at 257. The Agency met that burden here. The Agency produced evidence showing that career ladder promotions are not automatic, and that there are certain requirements that Park Rangers have to meet to be promoted both from the GS-5 to the GS-7 level, and again from the GS-7 to the GS-9 level. Specifically, the Agency, through the testimony of Erwin, Kelley, Hatten, and Joy, and through documentation, demonstrated that, to be promoted from a GS-5 to a GS-7, a Park Ranger must complete an informal interpretative program, consisting of eight logs of informal contacts with visitors, and a formal interpretative talk. Complainant was informed of these promotion requirements both in 1998 and 1999. Erwin and Kelley testified that the requirements were well known and discussed during roll call and performance evaluation meetings. Indeed, Complainant's performance plans and evaluations, although created while competencies were effective, show that he and his supervisor discussed the need for him to successfully complete a formal talk and eight informal logs. When Erwin asked about Complainant's progress toward completing the logs and formal presentation during the 1999 performance meeting, Complainant told Erwin that he was working on the requirements. In 2000, Erwin orally and in writing reiterated the promotion requirements. The evidence shows that Erwin had planned to meet with Complainant on December 14, 2000, to discuss Complainant's progress on the informal and formal interpretative requirements, but that Erwin was unable to meet with Complainant that day because he was absent from work. In fact, Complainant was absent the remainder of December 2000 and the first four months of 2001. By Complainant's own admission, he never completed the eight informal logs.

---

assumption here.

10

Complainant, of course, argues that the Agency's articulated reason for not promoting him is but a pretext for retaliation discrimination. Complainant's pretext argument has two major thrusts: (1) that, at the time that Complainant had served his time-in-grade, the Agency had no standard requirements for promotion, changing them conveniently to deny Complainant a promotion; and (2) even if the Agency had standard requirements for promotion, it failed to inform Complainant of those requirements, or give him the same opportunity to meet them, that it gave other rangers. Neither thrust has any merit. Complainant has presented no legally sufficient evidence that calls the Agency's proffered reasons for Complainant's nonpromotion into question.

As to Complainant's first argument, there was, admittedly, some confusion, in late 1999, as to whether Park Rangers had to be certified (by a certifier in Harpers Ferry) in the competencies as a requirement for promotion. It was precisely this confusion that prompted the grievances and discussions with the Union regarding the "competencies." Complainant makes much of Lawler's letter to Ranger Cochran stating that competencies are no longer a requirement. Complainant also makes much of the fact that the agreement with the Union, resolving the individual grievances, was not reduced to a formal writing. Complainant wants us to find that he was not subject to the "competencies," since certification in them was found not to be a prerequisite for promotion, nor subject to any other promotion requirements, since those would have been imposed only upon resolution of the Union grievance, i.e., after Complainant had met the time-in-grade requirement. Under Complainant's logic, Complainant met his time-in-grade requirement within some serendipitous limbo period wherein nothing more than time-in-grade was required of him to be promoted. However, the record is clear that, regardless of what they were called, and regardless of who had the authority to determine whether they were met, there were in effect standard promotion requirements, and that those requirements were communicated to the Rangers during their performance evaluations and during roll call meetings. Thus, while a Park Ranger may not now have to be certified by someone in Harpers Ferry as having met the "competencies," he still has to demonstrate to a supervisor that he has satisfactorily performed certain requirements, including a formal interpretative talk and eight logs. Complainant admitted that he has never completed the eight logs, one of the two key requirements for promotion.[13] In essence, this whole

---

[13] Complainant claimed that he had met the first requirement, the auditing of a formal interpretative presentation, on August 12, 1998. To support this claim, Complainant: (1) introduced a memo from supervisor Loren Goering auditing Complainant's interpretative program at the FDR Memorial, and (2) testified that Goering had not told him that his talk was not successful. (ROI, Exh. 12; T. 69). The Agency claimed that Complainant had not met the requirement, as shown by: (1) Goering's memo, (2) Erwin's testimony, and (3) the fact that Complainant's performance plan, reviewed two months after he gave the talk, does not show that the goal was completed, but "continuous." (T. 70-71, 166). Goering's memo, itself, never states whether Complainant's presentation was deemed successful (compare to Erwin's 2002 audit memo, stating plainly that Complainant had met the requirement). It does critique the presentation, making a few positive comments, along with several recommendations for improvement. Two points are noteworthy here. First, this talk was audited while Complainant was a GS-4, not a GS-5; thus, it does nothing to show that Complainant met the requirement as a

11

line of argument is a distinction without a difference.

Complainant's second argument, that he was neither given the information nor the opportunity to satisfy the promotion requirements, also fails. As stated above, the evidence demonstrates that the standards for promotion were common knowledge. Despite this, supervisor Erwin went further, and informed Complainant, both in a memo and personally, of the promotion requirements, and even gave him examples of the informal logs to guide his endeavors. Complainant, again, wants us to infer something insidious from the fact that Erwin's memo was not written until November 2000, after Complainant had consulted an EEO counselor. In point of fact, Complainant did not return to work regularly until July 2000, and then he went out on extended leave again in December 2000. The fact that supervisor Erwin neither hovered around Complainant, nor made Complainant's promotion his only priority, is not grounds for inferring retaliatory motivation, especially in light of the evidence that Erwin gave Complainant examples of other Rangers' work.

The Agency has also carried its burden of articulating a legitimate, nondiscriminatory reason for the offsets to Complainant's paychecks. The Agency, through the testimony of Erwin and Joy, and through documentation, demonstrated that Complainant was, on occasion, paid wages for times he was absent for work, and that the Agency had also paid Complainant's share of his health care premium while Complainant was in a non-pay status. The Agency had both the right, and the responsibility, as a governmental entity, to correct those errors and to recoup those monies.

Complainant offered little to rebut the Agency's proffered reason. Complainant did testify that, to the best of his recollection,[14] he was at work sometime during the last pay period in December 1999, one period for which his salary was offset. The documentary evidence belies that assertion. With respect to that documentary evidence, Complainant argues that the Agency did not produce the sign-in sheets for that period; however, the Agency did produce the supervisor's logs and leave requests. It bears repeating that Complainant bears the ultimate burden of proving discrimination; thus, it was Complainant who should have submitted the sign-in sheets if they did anything to rebut the Agency's claim. Moreover, Complainant testified that he did not recall ever receiving a letter regarding the second offset for that period as would have been required under the Debt Collection Improvement Act. This testimony was contradicted by Agency witness Gloria

---

GS-5. Second, even assuming arguendo that Goering's memo were interpreted as demonstrating that Complainant successfully completed a formal presentation in 1998, as a GS-4 to meet the requirements to be promoted from a GS-5 to a GS-7, there is no question that Complainant never completed the second promotion requirement.

[14] I note that Complainant's recollection failed him often during the hearing, especially when it came to recalling dates. As just one example, see T. 40. Complainant was asked when he filed an EEOC complaint and answered "Late 1999." Upon being shown a copy of the complaint, he noted the date of filing was "December 1, 2000." Complainant was off by a year.

12

Roberts, supervisor in the Debt Management Branch, who testified that the Agency sent Complainant the required notice on March 21, 2000, but that the Agency does not keep copies of such notices due to the sheer volume of notices involved. (T. 220-222). Finally, Complainant argues that the offset for the period August 27, 2000 through September 9, 2000, was based on a report that Complainant took sick leave on September 7 and 8, but that ROI, Exh. 22, p. 2, shows that no leave was taken by him during that period. That much is true, but ROI, Exh. 22, a summary of unknown origin, is contradicted by Roberts' testimony that her office received an amended time sheet changing 16 hours of regular time to sick leave for September 7 and 8, which amendment necessitated subsequent offsets for overpaid wages and night differential (T. 225-226). Roberts' testimony is corroborated by Agency Exh. 7, p. 10. Again, Complainant bears the burden of proof. Complainant simply has not met it.

In sum, the Agency articulated legitimate, nondiscriminatory reasons for the adverse actions taken against Complainant. Complainant was not promoted because he did not meet the promotion requirements. His wages were offset because he was erroneously overpaid. Once the prima facie inference of retaliation is dropped from the case, there is not a shred of evidence to prove that the adverse actions taken against Complainant were discriminatorily motivated by Complainant's previous EEOC activity. Complainant cannot demonstrate pretext simply by his unilateral belief. Complainant has not carried its burden of showing that the Agency's proffered reason is pretextual.

## VI. CONCLUSION

Having carefully considered the submissions of the parties, the testimony of the witnesses, the exhibits, the arguments of counsel, the applicable law, and the entire record herein, I conclude that the Agency did not discriminate against the Complainant.

*Leigh Anne Reardon*
Leigh Anne Reardon
Administrative Judge

13