# EXHIBIT 1

1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office

In the Matter of:                    )
                                     )
GEORGE CALLAHAN,                     )
                                     )
          Complainant,               )
                                     )
v.                                   )  EEOC No. 100-2001-07992X
                                     )  Agency No. FNP-2001-018
GALE A. NORTON, SECRETARY,           )
U.S. DEPARTMENT OF THE               )
INTERIOR,                            )
                                     )
          Agency.                    )
                                     )

                         Room 332
                         1951 Constitution Avenue, N.W.
                         Washington, D.C.

                         Tuesday,
                         February 3, 2004

          The above-entitled matter came on for

hearing, pursuant to notice, at 9:40 a.m.

          BEFORE:  HONORABLE LEIGH A. REARDON
                   Administrative Judge

          APPEARANCES:

          On behalf of the Complainant:

          A. PATRICIA FROHMAN, ESQ.
          4832 46th Street, Northwest
          Washington, D.C.  20016
          (202) 537-6114

APPEARANCES:   (Continued)

<u>On behalf of the Agency</u>:

PATRICIA ARMSTRONG
Office of the Solicitor
1849 C Street, Northwest
Mail Stop 6530
Washington, D.C.   20240
(202) 208-6848

<u>Also Present</u>:

Candace Levy

3

I N D E X

OPENING STATEMENT OF:                                              PAGE:

On behalf of the Complainant:                                     waived
A. Patricia Frohman, Esq.

On behalf of the Agency:                                            9
Patricia Armstrong


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| George Callahan | 15 | 48 | 66 / 72 | 70 / -- |
| Consuela Joy | 74 | 123 | 133 | 136 |
| Duane Erwin | 140 | 170 | 182 | -- |
| Suzanne Kelley | 183 | 195 | -- | -- |
| Lance Hatten | 198 | 205 | 209 | -- |
| Gloria Roberts (by telephone) | 211 | 230 | 239 | 240 |
| George Callahan (in rebuttal) | 242 | -- | -- | -- |


| EXHIBITS: | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| Complainant's: | | |
| Exhibit 1 | 38 | 39 |
| Agency's: | | |
| Exhibits 1.1 and 1.2 | 8 | -- |
| Exhibits 2-A through 2-K | 97 | 114 |
| Exhibit 3 | 149 | 149 |
| Exhibit 4 | 149 | 149 |
| Exhibit 5 | 142 | 143 |
| Exhibit 6 | 142 | 143 |
| Exhibit 7 | 214 | -- |

4

I N D E X

<u>CLOSING STATEMENT OF</u>:                                    <u>PAGE</u>:

On behalf of the Complainant:                          waived
A. Patricia Frohman, Esq.

On behalf of the Agency:                               waived
Patricia Armstrong

15

1  Honor?

2            JUDGE REARDON:  Yes.

3            (Pause)

4  Whereupon,

5                    GEORGE CALLAHAN

6  having been first duly sworn, was called as a witness

7  herein and was examined and testified as follows:

8                    DIRECT EXAMINATION

9            BY MS. FROHMAN:

10       Q    Mr. Callahan, would you state your name,

11  please?

12       A    George Gordon Callahan.

13       Q    And what is your address?

14       A    3332 F Street, Northwest.

15       Q    And your present employment?

16       A    National Park Service, Department of

17  Interior, Mall Operations.

18       Q    And your grade?

19       A    GS-5.

20       Q    When did you start doing any work for the

21  Park Service?

22       A    I began as a volunteer in 1991.

23       Q    And what were you doing then?

24       A    I had a -- I was a victim of a severe random

25  violence and had run across a few park rangers and they

16

1    had suggested that I become a volunteer, and I

2    volunteered at the 15th Street Kiosk, which was on the

3    far side of the Washington Monument.  It's a visitor's

4    information center, small.

5        Q    How often did you do volunteer work?

6        A    About -- averaged out over the year, about 20

7    hours a week.

8        Q    Every week?

9        A    Every week, yeah.

10       Q    And did you do anything other than at the

11   kiosk?

12       A    After a while some of the park rangers and

13   other volunteers asked that I go down and start

14   volunteering at Vietnam Veterans Memorial, which I did

15   do.

16       Q    How long did you serve as a volunteer at the

17   --

18       A    Until I was hired as a seasonal park ranger

19   in 1994.

20       Q    And after -- did you do any more volunteer

21   work thereafter?

22       A    After the completion of my stay as a seasonal

23   ranger, yes, I did.

24       Q    Until when?

25       A    It was a bit scattered afterwards because I

1    went to work as a -- one of the assistant managers of a

2    local hotel.

3         Q    But you continued --

4         A    I -- I did continue to volunteer.

5         Q    When you were a volunteer, did you receive

6    any commendations for your work?

7         A    Yes, I did.

8         Q    I would like to show you what is in the

9    record attached to Complainant's Opposition to Motion

10   for Summary Judgment, and attached is Exhibit A-1, A-2,

11   A-3, and A-4 to that motion and to your declaration in

12   that motion, and ask you if you can tell me what these

13   are, please?

14        A    Sure.  Thank you.

15             (Pause)  A-1 is -- reading it through.

16             (Pause)  It's a letter of recommendation by

17   my -- one of my initial supervisors, Mr. David Cruise.

18        Q    When you were a volunteer?

19        A    When I was a park ranger.

20        Q    Oh, sorry.

21        A    Okay.

22             (Pause)

23             MS. ARMSTRONG:  Can I see --

24             MS. FROHMAN:  Sure.

25             (Pause)

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1          MS. FROHMAN:  I'm sorry.

2          (Pause)

3          BY MS. FROHMAN:

4      Q    What about A-2?

5      A    (Pause)  A-2 is a letter of recommendation

6  that was given to me by Mr. James Lance, who was a VIP

7  coordinator.

8      Q    And when was that?

9      A    That's dated in 1993.

10     Q    Was that in reference to -- what was that in

11  reference to?

12     A    Work that I had done primarily down at the

13  Vietnam Veterans Memorial.

14         MS. FROHMAN:  Your Honor, I would like to

15  enter that into evidence as --

16         JUDGE REARDON:  Isn't this already --

17         MS. FROHMAN:  Yes, it is in evidence --

18         JUDGE REARDON:  -- one of the attachments?

19         MS. FROHMAN:  Right, right.

20         JUDGE REARDON:  So we don't need to admit

21  that again.

22         MS. FROHMAN:  All right, all right.

23         BY MS. FROHMAN:

24     Q    A-2 -- A-3?

25     A    A-3 is a letter of commendation from an

1    Arnold Goldstein, who was a former superintendent or

2    acting superintendent of the National Park Service here

3    on the Mall on a project I did -- done, excuse me, for

4    the Franklin Park, one of his pet projects.  I spent

5    about three weeks on it, including photography,

6    presenting the exhibit.

7         Q    And what about A-4?

8         A    A-4 is a certificate in appreciation of

9    service for the volunteers in park programs.

10        Q    Thank you.

11             Did there come a time when you applied for a

12   job?

13        A    As a seasonal or beyond seasonal?

14        Q    As a seasonal park ranger.

15        A    As a seasonal, yeah.  What had happened was a

16   couple of the supervisors who I had become familiar

17   with asked me to apply for a seasonal position that was

18   opening up.

19        Q    When was that?

20        A    That -- I believe that was in 1994.

21        Q    When you say "seasonal," what season are you

22   talking about?

23        A    It was 1994.

24        Q    Well, was it for the winter, summer?

25        A    Oh, I'm sorry.  Summer season.  I apologize.

1    Q    All right.  And how long did you work in that

2    position?

3    A    From approximately April through August, I

4    believe.

5    Q    And did you receive any -- did you receive

6    any condemnations -- commendations for your work as a

7    seasonal park ranger?

8    A    Yes, I did.

9    Q    And now I want to refer to Exhibit A-1 to

10   Complainant's Opposition to the Motion for Summary

11   Judgment, and ask you if that -- what is that?

12   A    (Pause)  That is a letter referring to my

13   work as a seasonal ranger.

14   Q    And what is the substance of the letter?

15   A    It identifies when I worked, which was '94 to

16   '95, the fact that he was my supervisor, and my

17   demeanor while I was working and how I continually

18   strove to improve, and I'm quoting from the letter.  He

19   concludes with a former supervisor, I'm oftentimes

20   called to write reference letters, and then he's pretty

21   laudatory in his comments about me and his regards to

22   me.

23   Q    Mr. Callahan, could you speak up a little?

24   A    Okay.

25   Q    Now, what did you do after you had served as

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    Thank you, Your Honor.

2              THE WITNESS:  Thank you, Your Honor.

3              BY MS. FROHMAN:

4        Q    Would you take a look at that agreement and

5    see what it says, please, with regard to what position

6    you would occupy?

7        A    (Pause)

8              JUDGE REARDON:  Did you find it?  Go ahead.

9    You may answer the question.

10             THE WITNESS:  Oh.  I didn't know.

11             "According to this agreement, the Complainant

12             shall be provided with a position of

13             interpretive park ranger, GS-4, Step 4, on

14             the National Mall and a lump sum of $15,000

15             in full and complete satisfaction of all

16             claims of monetary relief."

17             BY MS. FROHMAN:

18       Q    That's fine, Mr. Callahan.

19       A    Thank you.  Sorry about that.

20       Q    So, now, you answered that you were to be put

21   in a career ladder position, GS-5.  Do you recall how

22   you understood that?

23       A    Yes, that if I --

24       Q    Who told you that?

25       A    You.

25

1    Q    And did I tell you how I found that out?

2    A    Through Ms. Chang.

3    Q    Ms. -- who is Ms. Chang?

4    A    Ms. Chang was the attorney for Interior at

5    the time.

6    Q    Right.  And how long were you in a GS-4

7    position?

8    A    Ninety days, approximately.

9    Q    And was that your understanding, that you

10    would be in the GS-4 position for 90 days and then

11    promoted to a GS-5?

12    A    Yes, Ms. Frohman.

13    Q    And what was your understanding of a career

14    ladder position?

15    A    Career ladder position as I understood it, if

16    I -- that there were a few requirements that I spend

17    time in grade to move from a GS-5 to a GS-7 to a GS-9,

18    and that I meet the requirements.

19    Q    And how much time would you have to spend in

20    grade?

21    (Interruption)

22    BY MS. FROHMAN:

23    Q    What was your understanding --

24    A    A year.

25    Q    -- of how much time --

28

1       A    "Achieved."

2       Q    All right.  What work did you do as a GS-4?

3       A    As a GS-4, what you did was we covered all

4    the sites on the mall, gave interpretive talks,

5    resolved any problems that came up, and developed more

6    in-depth interpretive talks, depending on which site

7    you were assigned to.  You were given research time to

8    broaden your talks, learn more about the sort of

9    information that you were given -- giving, I'm sorry.

10      Q    And then, when you were promoted to a GS-5,

11   did your work change?

12      A    Essentially, no.

13      Q    When you were -- had become a GS-5, was

14   anything told you about what would be required for you

15   to be promoted to a GS-7?

16      A    That was the time -- approximate time there

17   was grievances going on on the Mall.

18      Q    Was anything told to you by your supervisors?

19      A    Not at the time, not that I recall.

20      Q    All right.  Was it mentioned to you that you

21   were in a career ladder position?

22      A    Yes.

23      Q    Were you told anything about giving an

24   interpretive talk or logs that you were to compile?

25      A    This was in 1998?

1      A    I was told that a lot of things were
2   necessary for promotion, but it -- it varied every time
3   I had asked about it.

4      Q    Well, now, before you -- I'm asking when you
5   were a GS-5.  Did you ask about promotion when you were
6   a GS-5 before your year was up?

7      A    No.

8      Q    And so, before your year was up were you told
9   anything about what --

10      A    No.

11      Q    All right.  That -- that was what I was
12   focusing on.

13      A    My apologies.

14      Q    The year when you were a GS-5, before you had
15   fulfilled your year.

16      A    My apologies.  I misunderstood.

17      Q    So, at that time were you told anything about
18   compiling your logs, that that was necessary for
19   promotion?

20      A    No.

21      Q    All right.  After you fulfilled your year as
22   a GS-5, were you given an evaluation?

23      A    Yes.

24      Q    And do you recall what the conclusion -- what
25   the evaluation stated with regard to whether you had

31

1    achieved or not achieved --

2         A    Achieved.

3         Q    -- the plan?  Achieved?

4         A    I have never gotten a "not achieved."

5         Q    And at that time, was anything said to you

6    about promotion?

7         A    This is at the end of my --

8         Q    First year.

9         A    At the end of my first year.

10        Q    Did your supervisor say anything to you about

11   promotion?  At the end of your first year.

12        A    At the end of my first year, I approached --

13   Mr. Erwin was then my supervisor.

14        Q    So you approached him?

15        A    Casually or informally.

16        Q    How long after your first year was that that

17   you did that?

18        A    It was in the area of my first year, probably

19   October or November.

20        Q    And what did he say to you then?

21        A    That he'd look into it.

22        Q    And did he ever come back to you and say

23   anything to you after you first asked him?

24        A    I asked him -- I asked him again informally,

25   and he said that he hadn't gotten around to it yet.

1      Q      So, did you speak to him many times or once,

2    twice?  How many times do you think you spoke to him?

3      A      Three or four times informally.

4      Q      And did he ever tell you he had gotten around

5    to it?

6      A      Around the fifth time that I had asked him.

7      Q      And what did he say then?

8      A      He had mentioned that there was a lot of

9    concentration on, A, that it wasn't in the resolution

10   agreement; that --

11     Q      Excuse me.  What resolution agreement?

12     A      I'm sorry.  The one that we had talked about.

13     Q      The settlement agreement?

14     A      Settlement agreement, I'm sorry.  That I had

15   taken too much time from -- off from work; that I had

16   to do an educational program.  Any time I approached

17   him it seemed that the answer seemed to change.  He

18   also did mention the interpretive logs.

19     Q      Now, had you heard about competencies?

20     A      Yes, I did.

21     Q      And how did you hear about them?

22     A      Through the union steward.

23     Q      Not through -- through your supervisor?

24     A      Most of the information I had gotten about

25   the competencies were via the union steward.

37

1    out and audit my talk anytime he felt like it.

2        Q    And did he ever do that?

3        A    Yes.

4        Q    He audited it?  He did come out and audit

5    your talk?

6        A    I believe so.

7        Q    Which talk was that?

8        A    I don't -- I'm treading.  (Pause)

9        Q    There was a time when -- when Mr. Erwin

10   audited a talk of yours?

11        MS. ARMSTRONG:  Objection.  I'm not sure if

12   that's leading, testifying to the question.

13        MS. FROHMAN:  It's a question.

14        JUDGE REARDON:  Well --

15        MS. FROHMAN:  I don't think it's leading.

16        JUDGE REARDON:  I think it's asked and

17   answered, though, if nothing else.  I mean, he said

18   there was one that was audited, he doesn't recall when,

19   by Mr. Erwin.

20        MS. FROHMAN:  All right.  Let me -- I would

21   like to offer this into evidence.  This is Shelly

22   Market.  This is not --

23        JUDGE REARDON:  This is not something that's

24   any attachment or a part of the ROI?

25        MS. FROHMAN:  -- something that's in --

1    right.

2              JUDGE REARDON:   Yes.   Please mark it as

3    Complainant's Exhibit 1.

4              MS. FROHMAN:   All right.

5                        (The document referred to was

6                        marked for identification as

7                        Complainant's Exhibit 1.)

8              BY MS. FROHMAN:

9         Q    Mr. Callahan, I'm going to show you what's

10   been marked as Complainant's Exhibit 1 and ask you if

11   you can tell me what this is.

12        A    (Pause)  This is evaluation of my talk dated

13   May 2002 at the Vietnam Veterans Memorial.

14        Q    And is that the talk that he audited?

15        A    Yes.

16        Q    Is there any other talk that he audited?

17        A    No.

18        Q    All right.  Thank you.

19             And prior to that, had you ever turned him

20   down when he asked you --

21        A    Never.

22        Q    -- to audit a talk?

23        A    Never.

24        Q    So that was the first time he had asked you?

25        A    Yes.

42

1       A    I -- any time that a talk audit had come up

2   either with Mr. Erwin or Mr. Goring or any of my

3   supervisors, I would always avail myself -- made myself

4   available, excuse me.

5       Q    What have you been doing as a GS-5 in the

6   last -- well, you were -- at the time, but what were

7   you doing during 1999 and 2000 as a GS-5 in your job?

8       A    Okay.  Giving interpretive talks at all of

9   the sites, checklists, walking tours.  I've done Make-

10  A-Wish programs.  Greater detail.

11      Q    Have you ever served as a lead ranger?

12      A    Since -- 51 times -- 52 times.

13      Q    You served as --

14      A    As lead ranger, yes.

15      Q    And to your knowledge, are there any other

16  rangers who were GS-5s?

17      A    No, not to my knowledge.

18      Q    So the people you were leading are --

19      A    Senior 9s.

20      Q    -- senior to you?

21      A    Mm-hmm.

22      Q    And what is a site checklist, you say?  Have

23  you performed those?

24      A    Yes, I have.  When you appear at a site,

25  there is a checklist that you're given to ensure, A,

44

1    A    Educational programs I've given in the past,

2   prior to my experience with the National Park Service.

3    Q    No, but had you given any as -- have you

4   given any educational programs as a ranger?

5    A    No.

6    Q    Okay.  Any other -- there came a time when

7   you said that you had missed a lot of work.  Mr. -- you

8   testified that Mr. Erwin said you had missed a lot of

9   work?

10    A    Yes.

11    Q    And is that true?

12    A    Yes.

13    Q    And why was that?

14    A    I have -- I'm in remission from cancer, and I

15   had cancer at the time and I was receiving

16   chemotherapy.

17    Q    And how much time would -- have you

18   calculated how much time you missed, approximately, a

19   year?

20    A    I might be inverting the numbers.

21   Approximately in 1999, some 50-some odd percent of the

22   time.  In 19 -- in 2000, perhaps 60.  The numbers may

23   be inverted.

24    Q    You missed --

25    A    Yes.

1    Q    -- 50 percent and 60 percent?

2    A    Mm-hmm, yes, I did.

3    Q    All right.  And when did you return to work

4    finally, that you had not had to have extended leave?

5    A    My returning to work during my chemotherapy,

6    I tried to return to work.  And it was not stressful.

7    It was a little draining.

8    You mean on a regular basis?

9    Q    No.  Well, yes.  I mean, when did you finish

10    with your cancer treatments?  Do you recall?  Was it in

11    2000?

12    A    I'm thinking of a way to answer this.

13    Q    Well, just the date.  Do you remember?

14    A    In 2000.

15    Q    In --

16    A    But -- yeah, 2000.

17    Q    When in 2000?

18    A    I'm not quite sure of the date, the exact

19    date.

20    Q    Was it in the summer, winter?

21    A    It was in the late spring, early summer, as I

22    recall.

23    Q    And since then, you have been there --

24    A    Pretty regularly.  What I was trying to get

25    to is something I wasn't aware of.  When you go --

52

1          MS. FROHMAN:  Excuse me.  May I ask, which

2    exhibit are you referring to?

3          MS. ARMSTRONG:  I'm at 15-A, page 3.

4          MS. FROHMAN:  (Pause)  Yes, thank you.

5          THE WITNESS:  Yes.

6          BY MS. ARMSTRONG:

7      Q    And you received this appraisal, at least,

8    looking at your signature, the standards, in October

9    '98?

10     A    Mm-hmm.

11     Q    And signed it in it appears 1999?

12     A    Yeah.

13     Q    And wasn't this attached to the performance

14    standards?

15     A    Yes, it was.

16     Q    Okay.  And isn't it true that the eight

17    informal logs are written products?

18     A    Yes.

19     Q    And isn't it true that you have not submitted

20    eight informal logs in 1999 nor in 2000?

21     A    Yes, or no.  No, I haven't.

22     Q    But it's still your testimony you didn't know

23    about these logs until 2000 when Mr. Erwin told you?

24          MS. FROHMAN:  Excuse me.  May I say that it

25    wasn't his testimony.  He testified that he had not

58

1    27.

2        A    Do you have the exhibit number?

3        Q    Exhibit 2, page 27.

4        A    (Pause)

5        Q    Isn't it a fact that you -- one week prior to

6    November 19th -- you had a meeting, sorry, November

7    13th in which you discussed the requirements to go from

8    the 5 to the 7 level?

9        A    Mm-hmm.  Yes, I'm sorry.

10        Q    And isn't it a fact when you came to Mr.

11    Erwin about promotion that you believed your EEO

12    settlement agreement entitled you to promotion based on

13    year in grade?

14        A    No.

15        Q    So you never stated that you had a promise

16    from the Agency or understanding with the Agency that

17    you would be promoted after one year to the 7 level?

18        A    No, it was that I was the -- that I was in a

19    career ladder position, that I was to meet the

20    requirements of everyone else who was in a career

21    ladder position.

22        Q    Oh, that's funny.  Did you tell the

23    investigator the same thing?

24        A    I don't recall.

25        Q    Okay.  Well, in your -- let's look at your

59

1    rebuttal statement to the EEO investigator, ROI Exhibit

2    11.

3         A    (Pause)

4         Q    Page 26.

5         A    (Pause)

6         Q    In line 13.

7         A    (Pause)    Line 13?

8         Q    Mm-hmm.

9         A    Okay.

10        Q    That you would spend a year as a 5, a year as

11   a 7, and a year as a 9?

12        A    Mm-hmm.

13        Q    Does it state anywhere in there that you

14   would have to do the -- the requirements for promotion?

15        A    Not that I see.

16        Q    Okay.  So it is your testimony that you need

17   to do the requirements in order to get promoted?

18        A    That I would have to live up to the

19   standards, sure.

20        Q    That all the other park rangers had to do to

21   get promoted from the 5 to the 7, is that your

22   testimony on today?

23        A    Yes.

24        Q    Okay.  Have you seen the responses to the

25   grievances that were submitted to --

69

1    Q    Okay.  And did your supervisor say anything
2    to you about this not being successful?
3    A    No.
4    Q    Was he -- did he tell you you must have
5    another talk in order to be promoted?
6    A    No.
7    Q    And as you recall during the year 2000, you
8    returned to work sometime in the spring or summer you
9    said?
10    A    Yes.
11    Q    And you were at work after that?
12    A    Yes.
13    Q    For the year.  And was -- who was your
14    supervisor then?
15    A    Mr. Erwin -- or Ms. Kelley.
16    Q    Ms. Kelley?
17    A    Yeah.
18    Q    Did Ms. Kelley ever talk to you about
19    auditing a talk?
20    A    No.
21    Q    Or turning in logs?
22    A    No.
23         MS. FROHMAN:  I have no further questions,
24    Your Honor.
25         JUDGE REARDON:  Ms. Armstrong?

73

1    to be promoted you would have to turn in eight logs of

2    -- of informal contact?

3        A    Specifically?

4        Q    When were you first told that?  Was it before

5    or after you filed your --

6        A    After I filed --

7        Q    -- EEO complaint?

8        A    -- my EEO complaint.  And it was done in that

9    memo.  Mention had been -- may have been made about it

10   casually, but then mention of what I had to do was --

11   was mentioned a lot of things -- about a lot of things,

12   excuse me.

13       Q    As a requirement for promotion or simply as

14   something that should be done?

15       A    Something that should be done.

16           MS. FROHMAN:  I have no further questions.

17           MS. ARMSTRONG:  No questions.

18           JUDGE REARDON:  Thank you very much for your

19   testimony, Mr. Callahan.  Please don't discuss your

20   testimony with anyone other than your attorney outside

21   of this hearing room today.

22           THE WITNESS:  Yes, Your Honor.

23           JUDGE REARDON:  Thank you.

24           (Whereupon, the witness was excused.)

25           JUDGE REARDON:  Let's go off the record for a

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1          THE WITNESS:  Mm-hmm.

2          JUDGE REARDON:  -- are those documented

3     anywhere?

4          THE WITNESS:  What do you mean?

5          JUDGE REARDON:  Is there some document that

6     sets out, these are the requirements you must meet as

7     of October 1999?

8          THE WITNESS:  Those are the documents that's

9     displayed in your classification standards and your

10    qualification standards.  Those are the things that

11    establish any kind of promotion.  In other words, you

12    cannot promote an individual that's not consistent with

13    your classification standards and your quals.

14         JUDGE REARDON:  And these -- this competency

15    idea or this -- that you need to provide a formal

16    presentation and make eight logs, does -- is there some

17    document that says that?

18         THE WITNESS:  No, because competencies wasn't

19    required.  What was required is that you present your

20    interpretive talks, both formal and informal.

21    Management established how they intend to measure that.

22    The way they intended to measure it was to establish

23    the logs and tie it back to the interpretive talks on

24    an informal basis and to audit the formal.

25         If you were in a very tiny park that only had

119

1    three rangers, the process that they may use may be a

2    personal observation on an everyday basis, but because

3    our rangers cover the entire Mall, which is the

4    Lincoln, the Jefferson, the Korean, the Japanese, and

5    we only have one supervisor for let's say 10 people on

6    a seven-day-a-week operation of a 16-hour shift, you

7    couldn't actually be there to observe that.

8         So from a consistency standpoint, they

9    decided that their way of doing it, which preexisted

10   the competencies and anything of that nature, was for

11   them to have their logs.  And so logs was always the

12   method by which they looked at performance and

13   determined whether or not they made the necessary

14   contacts.

15        JUDGE REARDON:  And at one point you said you

16   had to meet the X-118 qualifications?

17        THE WITNESS:  Yes.

18        JUDGE REARDON:  What are those?

19        THE WITNESS:  Okay.  In the federal

20   government you have what's called the X-118 quals.  The

21   X-118 quals spells out the knowledges, skills, and

22   abilities to do the job.  In other words, what is a

23   ranger expected to do in a specialized knowledge area

24   at the Grade 5 level, at the Grade 7 level, all the way

25   up to the Grade 14 level.  It spells it out for you.

125

1      A     Mr. Reginald Barkley made that decision.

2      Q     All right.  So this is actually the only

3   memorandum of the agreement, is that correct?

4      A     That's a memorandum that Ms. Stanzack did

5   that is her recollection of the meeting.

6      Q     Is there any other memorandum?

7      A     No, we did not enter into a formal agreement.

8      Q     I do not see here or, actually, in any of the

9   exhibits with regard to solutions to agreements or

10  resolutions of agreements a reference to the word

11  "logs."

12     A     The informal interpretation was done through

13  a log system.  That was the method by which management

14  was evaluating the individual's performance.  If you do

15  something on an informal basis, they had two choices:

16  the choice of observation or the choice of taking the

17  employee's word as to what they did.  And they chose to

18  accept the employee's word as to what the employee did

19  and the employee's summary of that contact.

20     Q     Well, I was just curious to know where that

21  is written.

22     A     It is not written.  It is a method by which

23  you measure performance.  Every method by which you

24  measure performance is not written.

25     Q     So, it's -- it's -- there's no place that

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

126

1   states that they have to have turned in eight logs?

2       A    No, but it is a thing that says that the

3   supervisor would have had to determine that the

4   individual has satisfactorily delivered --

5       Q    I understand you.

6       A    -- the informal interpretation.

7       Q    And also, the number eight doesn't seem to be

8   written anywhere.

9       A    But it is clearly identified from the

10  supervisor to the employee.  I am not one of the

11  supervisors.  The supervisors would have to testify to

12  that.

13      Q    All right.  You stated that you advised Mr.

14  Hatten --

15      A    Who was the site manager.

16      Q    Right -- to talk to Mr. Callahan about what

17  has --

18      A    No, I did not.  I indicated that I advised

19  the site manager to advise Mr. Callahan's supervisor --

20      Q    Okay.

21      A    -- to have a conversation with Mr. Callahan.

22      Q    Fine.  And according to Exhibit 2, page 27 in

23  the record of investigation --

24      A    (Pause)  Exhibit 2?

25      Q    Mm-hmm.

156

1    differential pay on that -- those days?

2        A    Yes.

3        Q    Let's look at ROI Exhibit Number 23, page 73.

4        A    (Pause)

5        Q    I'm sorry, 23, page 73.  Or 72; 72, 73.

6        A    (Pause)

7        Q    Really 73, for Thursday and Friday, September

8    7th and 8th.  Did Mr. Callahan receive night

9    differential pay?

10       A    Yes.

11       Q    And how do you know that?

12       A    It's marked here for the second week 130,

13   which is night differential, for both Thursday and

14   Friday.

15       Q    Was that a mistake?

16       A    Yes.

17       Q    Okay.  Mr. Erwin, were you aware that Mr.

18   Callahan had filed an EEO complaint in 1997?

19       A    Yes.

20       Q    And how did you become aware of that fact?

21       A    He told me that.

22       Q    And when did he tell you about the EEO

23   complaint?

24       A    I believe in 1999.

25       Q    And do you know why he told you?

1      A     It was -- I'm not -- I'm not completely sure.

2    I think it was when we were instituting his

3    performance plan.

4      Q     And were you involved in that complaint at

5    all?

6      A     No.

7      Q     When did Mr. Callahan come to you in

8    reference to promotion to the GS-7 level?

9      A     I think in 2000.

10     Q     And what did Mr. Callahan state to you with

11   respect to promotion?

12     A     That he had an agreement that all he had to

13   do for a promotion was have one year time in grade.

14     Q     And what -- you said he had an agreement.

15   What agreement --

16     A     He said that he had an agreement because of

17   his previous grievance with the Park Service that there

18   was an agreement that for him to be promoted all he

19   would have to do -- the only standard that he would

20   have to meet was the time in grade.

21     Q     And when you say grievance, did he state --

22   what did he state with respect to a grievance?  Was it

23   an EEO complaint?

24     A     The EEO complaint.

25     Q     And what was your response?

1    didn't -- didn't do it.

2        Q    Now, you didn't mention the video talks in

3    your testimony here.  Did you ever suggest to him -- do

4    you recall whether you ever suggested a video talk to

5    him?

6        A    I don't know if I suggested to him make a

7    video talk or not.  The rangers know that it's

8    available and can be done that way.  It could very

9    possibly have been mentioned when we were talking about

10    it.

11        Q    Do you recall that Mr. Callahan invited you

12    to audit him whenever you wanted, he was ready?

13        A    He said, you know, just come out whenever.

14    Usually we'd try to set a specific time for you to come

15    out to see -- to audit a talk.

16        Q    Now, I believe you testified that Mr.

17    Callahan first talked to you in 2000 about his desire

18    to be promoted?

19        A    I believe that's correct.

20        Q    Do you recall whether he brought it up around

21    the time that his first year was -- he spent a year in

22    grade, which was October of 1999?

23        A    I don't know.  He may have.

24        Q    But the -- you gave him an answer in a memo

25    -- let me just -- Ms. Armstrong referred to it.  I

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    don't have it here -- a memo in December of 2000.

2    That's when you told him the requirements for him to

3    give -- you put down in writing that he was --

4         A   That's when I put down in -- in writing --

5         Q   Right, right.

6         A   -- as far as that one, but it had been put

7    down in writing before that.

8         Q   For him?

9         A   For -- I believe so.

10        Q   Is there a document --

11        A   Other than outside the performance plan, I

12    don't know.

13        Q   Were you aware at that time that he had filed

14    an EEO complaint -- that he'd been to an EEO counselor?

15    I don't mean his previous complaint.  I mean that he

16    had filed an EEO complaint for not being promoted after

17    one or two years in grade.

18        A   Did I know at that time -- I'm sorry, what

19    time?

20        Q   When you made -- when you -- when you told

21    him -- had a talk with him and wrote him a memo as to

22    what was required for him to be promoted.

23        A   Yes, I believe so.

24        Q   You knew he had already been to a counselor

25    about not being promoted?

1    A.    Yeah, I think so.

2    Q    And are you saying that you did write him a

3    memo prior to that, or you did not?

4    A    Prior to -- I'm sorry.  I'm kind of confused

5    by the dates.

6    Q    Prior to -- I'm sorry.  Prior to your memo of

7    December 20 I think it is 2000.

8    A    I cannot --

9    MS. FROHMAN:  What's the date?  I'm sorry.

10    THE WITNESS:  -- I don't know that I can

11    produce something in writing other than the performance

12    plan that is put together.

13    BY MS. FROHMAN:

14    Q    You're referring to the performance plan in

15    --

16    A    That Lauren Goring started and I signed off

17    on that we looked at.

18    Q    Now, the plan in 15-B, which I believe Mr.

19    Goring wrote --

20    A    Right.

21    Q    -- that says that "integrate Module 101

22    principles," et cetera, "review with supervisor," and

23    that was to be completed by September 30, 1998.

24    A    Right.  This is -- this is a goal.  It's

25    something you work for.  The dates are just something

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1    to try to give the ranger something that they can set

2    for themselves.

3        Q    And then the rest is set N/A, not applicable.

4            MS. ARMSTRONG:  Do you have 15?

5            MS. FROHMAN:  This is --

6            MS. ARMSTRONG:  There are two.

7            MS. FROHMAN:  -- 15-B.  I know there is,

8    right.  I was first going to --

9            JUDGE REARDON:  I think you were asking about

10   15-B, correct?

11           MS. FROHMAN:  Yes, correct.

12           THE WITNESS:  Oh, okay.

13           (Pause)

14           BY MS. FROHMAN:

15       Q    It's on page 3 --

16       A    Okay.  Those --

17       Q    -- of 15-B.

18       A    -- those are signed -- that was done by

19   Lauren Goring, so --

20       Q    Right, right.

21       A    -- I couldn't tell you why he put N/A.

22       Q    Okay.  Well, he said those weren't

23   applicable.  Anyway, he was rated "achieved," right?

24       A    Yes.

25       Q    Now, in 15-A, that plan talks about "Goal 1

1   was continuous."

2      A   Yes.

3      Q   Goal 2 talks about "start collecting

4   interpretive contacts for the informal interpretation

5   log. Collect eight usable contacts," et cetera. And

6   it says, "will reassess after Module 101 training."

7   Was that ever done?

8      A   I do not know.

9      Q   And then, Goal 3, December 31, 1998, "test

10   tape reviewed with supervisor." What does that mean?

11   Was it reviewed?

12      A   That would mean that he would produce a tape

13   and it would be reviewed with his supervisor.

14      Q   By December 31, 1998?

15      A   Right.

16      Q   Okay.

17      A   So Lauren apparently told him that he could

18   do a videotape and then he would watch the videotape

19   with him and tell him what he thought about it.

20      Q   And you don't know whether that was ever

21   done?

22      A   I don't know.

23      Q   He was rated "achieved." That was done by

24   you, right?

25      A   Yes.

1     Q     Okay.  But you really didn't know whether he

2  had done the things in his plan that would have been

3  laid out?

4     A     I -- when I talked to him, when I signed off

5  on it, he said that he had been working towards

6  achieving things.

7     Q     The competencies you said remained in effect.

8  I believe you testified to that, that the competencies

9  remained in effect but they were incorporated in an

10  agreement with the union?

11          MS. ARMSTRONG:  Objection.

12          MS. FROHMAN:  I'm sorry.  Whatever he said.

13  He did say the competencies.

14          JUDGE REARDON:  I'm going to overrule the

15  objection.  Please answer the question, if you can.

16          THE WITNESS:  Okay.  I think what you're

17  referring to is, I said the competencies still exist.

18  The rangers can still go out and become certified in

19  these different modules.  But for promotion, you do not

20  have to be certified.  That's the only difference.  You

21  don't have to be certified.  You have to -- to be able

22  to do them to the satisfaction of your supervisor.

23          BY MS. FROHMAN:

24     Q     Are you familiar with -- it's a letter at

25  page 4 of Exhibit 12 of the record, and it's from the

178

1    regional director of the National Capital Region to

2    Adam Cochran in response to his grievance.  It's dated

3    December 20, 1999.  It's page 4 of Exhibit --

4         A    Yeah, Exhibit 12.

5         Q    -- 12.  Did you ever see that letter?

6         A    (Pause)  I don't know whether I -- I couldn't

7    say whether I'd seen it or not.

8         Q    Are you familiar with the fact that he made

9    the statement in that letter,

10              "While it is highly desirable that employees

11              achieve the competencies, it is not a

12              requirement for a promotion.  An employee

13              must meet the Office of Personnel Management

14              X-118 qualification standards and have worked

15              one year at the next lower grade in order to

16              qualify for -- for promotion"?

17         A    Yes.

18         Q    All right.  So it was -- so you are familiar

19    with the fact that the regional director had ruled that

20    these competencies were not necessary to be -- for

21    promotion and that only the X-118 --

22         A    Achieve the competencies, I -- well, I think

23    what he meant was the -- the certification of them.

24         Q    Well, he says if an employee meets the X-118

25    qualifications standards and has demonstrated the

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1   ability to perform at the next higher grade, he/she is

2   eligible for a promotion.  He doesn't talk about having

3   --

4           MS. ARMSTRONG:  Objection.  This is

5   argumentative.

6           MS. FROHMAN:  Well, I'm just trying to

7   explain --

8           MS. ARMSTRONG:  -- question.

9           MS. FROHMAN:  -- answer the question.

10          JUDGE REARDON:  Right.  Do you -- I -- do you

11  have a question?

12          MS. FROHMAN:  Yes.

13          BY MS. FROHMAN:

14      Q    My question is, how do you interpret that

15  statement?

16      A    This statement -- I interpreted that -- that

17  we desire employees to be certified but it is -- in the

18  competencies, but it is not mandatory for promotion

19  that they are certified in them.

20      Q    Then --

21      A    I think when he says "achieve the

22  competencies," that is what he -- he means, is

23  certified.

24      Q    But that's not what he says, right?

25          MS. ARMSTRONG:  Objection.

1          JUDGE REARDON:  Sustained.

2          BY MS. FROHMAN:

3          Q    Did you participate in -- in anything to do

4     with the union talks as to what would be required for

5     promotion?

6          A    No.

7          Q    And have you seen any document that sets

8     forth requirements for promotion, that it's a

9     supervised formal talk and eight logs?

10         A    Yes.

11         Q    And what document is that?

12         A    There was a memorandum that was given out

13    that said what -- what the parameters were.

14         Q    Do you know what memorandum that is, by any

15    chance?

16         A    I couldn't tell you.

17         Q    Could it have been from the union steward?

18         A    I don't know.

19         MS. FROHMAN:  Okay.  I don't think I have any

20    further questions.

21         JUDGE REARDON:  I have just a couple.  I'm

22    going to refer you back to Exhibit 15-A, page 3.  This

23    performance agreement is developed at what point in

24    time?

25         THE WITNESS:  If you look at the -- the page

181

1    here when they have the -- when the plan is

2    established, that's when you would go over here.  And

3    basically, this is like a game plan for the coming

4    year.  This is what we want to work towards.  It's just

5    a way to set goals for the -- for the ranger.

6              JUDGE REARDON:  Now, Mr. Goring was the

7    supervisor in 1998 who would have filled this --

8              THE WITNESS:  Right.  This is --

9              JUDGE REARDON:  -- would have filled this

10   out?

11             THE WITNESS:  Yes.

12             JUDGE REARDON:  And you said you spoke to Mr.

13   Callahan then at the end of this rating period, which

14   would have been 1999, and asked him basically what

15   progress he had made on these, and he said he was

16   working towards them, is that your testimony?

17             THE WITNESS:  Yes.

18             JUDGE REARDON:  Which would -- I can -- I

19   infer from that statement that he had not met them yet?

20             THE WITNESS:  No.

21             JUDGE REARDON:  So, is it your testimony he

22   had met them in 1999?

23             THE WITNESS:  He had not met them.

24             JUDGE REARDON:  He had not met them.

25             And who would have done the reassessing after

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

1      Q    And did he tell you why he was interested in

2    being promoted?

3      A    He -- he alleged that there was a -- some

4    sort of agreement which stipulated that the -- Mr.

5    Callahan should be promoted.

6      Q    Did you respond to Mr. Erwin's --

7      A    I asked for a copy of the -- any

8    documentation, and based upon that, we would be able to

9    respond to Mr. Callahan's request.

10      Q    And -- and what did you -- did you obtain

11    documentation?

12      A    I never received any such documentation.

13      Q    And who were you requesting documentation

14    from?

15      A    From Supervisory Park Ranger Duane Erwin.

16      Q    And who was he supposed to get the

17    documentation from?

18      A    From Mr. Callahan.

19      Q    Okay.  Mr. Erwin, when you were in the Mall

20    in July 2000 through January 2003, what were the

21    requirements for a ranger promotion from the GS-5 to

22    the GS-7 level?

23      A    First, the ranger must meet the time in grade

24    requirement, which is one year time in grade.

25    Secondly, they must also submit to their supervisor a

202

1    log of informal visitor contacts, and they, in addition

2    to that, must also successfully present a formal

3    interpretive program which too is audited and reviewed

4    by the person's supervisor.

5        Q    Do you know when those requirements became --

6        A    I believe sometime shortly before my assuming

7    the position as site manager in July of 2000.

8        Q    Okay.  Did you know -- were you there when

9    competencies were in effect for promotion purposes?

10       A    Well, no, I -- when I arrived, there had been

11   a grievance which had been resolved, a set of

12   grievances which had been resolved.  So I -- I arrived

13   on the tail end of that and the standard had been

14   established --

15       Q    Okay.

16       A    -- as a supervisor actually reviewing a

17   ranger's work and that would set the standard for

18   advancement.

19       Q    And prior to that, did you know what was

20   required, who would certify, that --

21       A    No, I couldn't speak to what happened, you

22   know, prior to my arrival.

23       Q    Okay.  And can you tell us your -- your

24   understanding of what "informal logs" would --

25       A    It -- it's a series of interactions which are